COMMONWEALTH of Pennsylvania,
Appellant

v.

Paul R. WEAKLEY, Appellee (at 1054).

Commonwealth of Pennsylvania,
Appellant

v.

Hugo M. Selenski, Appellee (at 1052).

Superior Court of Pennsylvania.

Argued March 19, 2008.
Filed April 17, 2009.

Jacqueline M. Carroll, Asst. Dist. Atty., Yatesville, for the Com., appellant.

Paul Galante, West Pittson, for Weakly, appellee.

Robert M. Buttner, Scranton, for Selenski, appellee.

BEFORE: STEVENS, LALLY-GREEN, and FITZGERALD,* JJ.

OPINION BY STEVENS, J.:

■ ¶ 1 The Commonwealth of Pennsylvania files this consolidated appeal[1] from the pre-trial order[2] entered in the Luzerne County Court of Common Pleas, which granted defense motions *in limine* by Appellees Paul R. Weakley ("Weakley") and Hugo M. Selenski ("Selenski") to exclude evidence of subsequent other crimes from admission at their criminal homicide trial. Because we find the other crime so distinctive in its manner of execution and so similar to the charged crime as to be admissible for the purpose of showing identity, we reverse.

*Facts Related to Homicides*

¶ 2 The Commonwealth submitted affidavits of probable cause to the trial court in conjunction with disposition of pre-trial motions, which summarized the Commonwealth's proffered evidence as to the homicides. The affidavits were executed on May 19, 2006, by detectives from the Luzerne County District Attorney's Office, as well as by law enforcement officers from the Pennsylvania State Police.

¶ 3 According to the affidavits, homicide victim Michael Kerkowski, Jr., a licensed pharmacist and owner of a pharmacy, was arrested in April 2001 and subsequently convicted of selling controlled substances illegally. He failed to appear at his sentencing hearing on May 14, 2002, and it was presumed that he had absconded. On May 6, 2002, Gerry Kerkowski, Michael's mother, reported that Michael and Tammy Fassett were both missing. In December 2002, Michael Kerkowski, Sr., reported an assault and robbery of his residence. He stated that his son, Michael, had entrusted $60,000 to him in April 2001, and the money was placed in an unused vent in the basement. Only he and Michael knew of the money and its location. During Michael's trial for illegal sale of narcotics, he introduced Selenski to Kerkowski, Sr., as his best friend, and advised his father to trust Selenski. Kerkowski, Sr. also related that in July 2002, he met with Selenski, who said that he had spoken with Michael subsequent to May 3, 2002, and that Michael had not fled, but needed $30,000 to aid in his legal defense. Selenski also indicated that he knew about the $60,000 hidden in the basement, prompting Kerkowski, Sr. to give Selenski the requested $30,000.

¶ 4 According to Kerkowski, Sr., in June or July 2002, Weakley, using the alias of "Eric," approached him and asked for $10,000 in order to repair a computer so he could keep in contact with Kerkowski, Jr., but Kerkowski, Sr., refused to tender the

---

* Former Justice specially assigned to Superior Court.

1. We consolidate the cases *sua sponte* because the claims against these codefendants are the same. *See Commonwealth v. Galletta,* 864 A.2d 532, 533 n. 1 (Pa.Super.2004). We further note that the Commonwealth's arguments in the briefs for both cases are exactly the same. Accordingly, our citations to the Commonwealth's briefs refer to either case.

2. The Commonwealth may take an appeal of right from an order that does not end the entire case if the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution. Pa.R.A.P. 311(d); *Commonwealth v. Torres,* 564 Pa. 86, 764 A.2d 532, 536 n. 2 (2001). The Commonwealth has filed such a certification in this case.

money unless he could speak with his son. Kerkowski, Sr., then contacted Selenski who told him not to give money to "Eric." In August 2002, Selenski again contacted Kerkowski, Sr., who gave him an additional $30,000. Kerkowski, Sr., asked if he could speak to Michael, to which Selenski responded he would see what he could do. In September or October 2002, Selenski again met with Kerkowski, Sr., and asked for more money. Kerkowski, Sr., refused to provide any further funds until he could talk to Michael. At that time, Selenski produced a pistol, demanded money and fired the weapon, whereupon Kerkowski, Sr., gave Selenski $40,000.

¶ 5 Beginning in June 2003, Weakley provided statements to District Attorney detectives implicating Selenski as well as himself in the homicides of Kerkowski, Jr. and Fassett. Weakley denied being present at the homicides, but stated that he helped Selenski rebury the bodies on or about May 6, 2002, in the grounds at 479 Mt. Olivet Road, Kingston Township, which was in the process of being conveyed to Selenski and Tina Strom, Selenski's girlfriend.

¶ 6 On June 5, 2003, a search warrant was served at the Mount Olivet property. Weakley accompanied the authorities to the property and pointed out the burial site.[3] As a result, Kerkowski, Jr.'s and Fassett's remains were discovered, along with flex ties and duct tape. An autopsy report found the cause of death as strangulation, and the manner of death as homicide.[4]

¶ 7 Investigators further discovered that Weakley had purchased digging tools from a hardware store on May 4, 2002. Weakley also purchased a cell phone and was in constant communication with Selenski from May 3, 2002, through May 5, 2002, about 36 total calls. Contrary to Weakley's statements, investigators also discovered that Weakley did not work on May 3, 2002.[5]

*Facts Related to Robbery*

¶ 8 On August 6, 2006, Selenski and Weakley were charged with breaking into the home of Samuel Goosay, a jeweler, on January 27, 2003, which was approximately 8 months after the date of the alleged homicides of Kerkowski, Jr. and Fassett on May 3, 2003. At the time of the within pre-trial motion, Selenski and Weakley had not been tried for that offense. Instead, the Commonwealth provided the trial court with copies of the affidavits of probable cause for the arrest of Selenski and Weakley, as well as Goosay's testimony at

3. Weakley had also accompanied the authorities to the field behind Dallas High School, where the bodies had first been purportedly buried by Selenski and another person. Weakley could not locate the purported burial site. Subsequent investigations by local and federal forensic experts could not locate a burial site in the field behind the Dallas High school.

4. A person named "Reese" provided information about a meeting between Selenski and Kerkowski Sr, where Kerkowski, Sr., refused to give Selenski money because he did not know if his son was alive. Another person, named "Samson," advised that in April or May 2003, Selenski offered him $20,000 if he would help Selenski "dispose" of a pharma-

cist who had been arrested for selling oxycotin. Earnest Culp, who had rented a trailer on the Mt. Olivet Road property prior to Selenski's purchase, told investigators that he encountered Selenski and Weakley on the property near a freshly dug area, and that Selenski said he wanted to place a gasoline tank in the area.

5. Subsequent to the trial court's issuance of the instant order, the Commonwealth averred in its Notice of Aggravating Circumstances, dated June 20, 2008, that Weakley has entered a guilty plea to a federal RICO charge, 18 U.S.C. § 1962(d), encompassing the murder charges, resulting in a "life" sentence on June 13, 2008.

the preliminary hearing for the robbery offense.

¶ 9 The trial court summarized the circumstances of the Goosay robbery:

[On] January 27, 2003, at approximately 6:30 p.m., two men forcibly entered Goosay's residence through a rear door. One of the men displayed a firearm and ordered Goosay to the floor. The other suspect handcuffed Goosay behind his back with metal handcuffs, put duct tape over his eyes and removed approximately $800 from his pants pocket.... They removed the metal handcuffs and rebound Goosay's hands in front with plastic flex ties.[14]

One of the suspects lost a glove and threatened to burn the house down if he couldn't find it. The man with the firearm remained behind while the other man left in Goosay's car.... Shortly thereafter, Goosay received a call that there was a break-in at his business (a jewelry store). A break-in at Goosay's jewelry shop was attempted by an unknown white male who fled, leaving Goosay's car, when the alarm went off. The other man left after the call. The police found that a large amount of jewelry was stolen from the residence. They recovered a plastic flex cuff, a bloodstained dishcloth and a ski glove at Goosay's house and two bloodstained dishcloths, a travel bag and latex gloves from Goosay's car. There was also a sneaker footprint.

located in the car, Goosay identified Weakley early on and, on August 27, 2003, Weakley admitted to the robbery and stated that Selenski was involved in and planned the robbery. Weakley indicated that Selenski held Goosay at gunpoint using a BB-type handgun while Weakley secured Goosay with handcuffs and put duct tape over his eyes and mouth. Later, Goosay identified Selenski. The sneaker print allegedly matches a sneaker of Selenski's found at Mount Olivet Road, and a BB-type pistol found in a vehicle operated by Selenski during the June 2003 search of Mt. Olivet Road was consistent with the weapon described by Goosay.... When Mt. Olivet Road was searched, plastic flex ties, duct tape, metal handcuffs and rope were found and duct tape was found at Weakley's residence and in a vehicle he used. A black BB-type pistol was found in a vehicle operated by Selenski.

Trial Ct. Op. at 17–19 (citations omitted).[6]

¶ 10 The trial court also commented on the flex ties and duct tape:

The Goosay duct tape and plastic flex cuffs were compared to the duct tape and flex ties found on the bodies of Kerkowski and Fassett and found to be visually and microscopically similar.[15]

---

14. The usual name of this item is "175N cable ties." Plastic cable ties can be purchased in lengths of 18–48" at most hardware stores.

---

[The] Monroe County affidavit of probable cause indicates that Weakley's DNA was found on one of the dishcloths

---

6. The trial court addressed both Selenski's and Weakley's issues in the same opinion.

---

15. The laboratory report of August 21, 2004 was submitted into the record at the [motion in limine] hearing of April 27, 2007. It reads in pertinent part as to some of the items submitted: "The (tape/wire ties) from (Goosay) (was/were) consistent visually, stereomicrosopically and instrumentally with the (tape/wire) (tape/wire) from the (Kerkowski/Fassett investigation)." The report indicates that the tapes "**could** have originated from the (same) roll of tape" or "**could** share a common origin" with the wire ties. Notably, several of the duct tape samples and wire

Therefore, we refer to both opinions simply as "Trial Ct. Op."

ties submitted, according to the lab report "do **not** share a common origin/source." [(emphasis added by trial court)]. Also notably, the report does not say that any of the Goosay samples are definitively from the same source (*e.g.* the same batch of plastic ties or duct tape from the factory, plastic ties or duct tape purchased from the same store, duct tape cut or torn in a matching way, etc.).

---

The Commonwealth has not specifically indicated what evidence from the Goosay robbery it proposes to introduce. At argument on April 27, 2007, it was indicated that Samuel Goosay and an expert on the cable ties would be called as witnesses at the trial of Selenski and Weakley for the Kerkowski/Fassett homicides. It also appears that the Commonwealth intends to introduce physical evidence from the Goosay robbery (flex ties, duct tape, bloodstained dishcloths), laboratory reports and/or the testimony of the lab technicians concerning microscopic analysis of the flex ties, duct tape and dishcloths, DNA test results, police officers and security guards involved in the Goosay incident, and police sketches and/or photographs purporting to be of Selenski and Weakley—in short, a mini-trial of the Goosay case within this case.

Trial Ct. Op. at 19–20.

¶ 11 The Commonwealth filed its notice of intent to seek admission of evidence of other crimes, on October 16, 2006, stating that it intended at the homicide trial to offer testimony regarding the robbery committed against Samuel Goosay on or about January 27, 2003. In addition to the above summarized information, the Commonwealth also provided the trial court with copies of Kerkowski, Sr.'s testimony at Selenski's preliminary hearing, as well as the full 476–page transcript of the 8–hour proceeding. The trial court granted the defense motion to exclude evidence of the Goosay robbery in the within homicide

trial. The Commonwealth filed the instant appeal, posing the question:

Did the trial court abuse its discretion in excluding evidence of a subsequent and similar crime by the Defendant, where the Commonwealth presented twelve (12) similarities between that crime and the crime at issue that were relevant to prove the Defendant's identity, motive, intent, knowledge, opportunity and/or preparation if the court considered each similarity separately as opposed to together?

Commonwealth's Brief at 4.

■ ¶ 12 The essential thrust of the Commonwealth's argument on appeal is that the trial court erred in granting the defense motion *in limine* because "evidence of the Goosay robbery was admissible due to the great number of similarities between the crimes." *Id.* at 12. The Commonwealth contends the similarities between the two sets of crimes "create the logical inference that the accused are the persons who committed both sets of crimes, and go to the defendant's identity, motive, intent, knowledge, opportunity and/or preparation." *Id.* at 12. The twelve purported similarities posited by the Commonwealth are:

(1) Both crimes were allegedly committed by Selenski and co-defendant Weakley;

(2) Flex ties found on the bodies of the homicide victims were visually, instrumentally, and steromicroscopically similar to those removed from Samuel Goosay, the victim of the subsequent robbery;

(3) Flex ties were used to bind the hands of Kerkowski and Fassett in the homicides, and used to bind the hands of Goosay in the robbery.

(4) Duct tape found on the body of the homicide victim Kerkowski was visu-

ally, instrumentally and stereomicroscopically similar to the tape removed from Goosay, the robbery victim;

(5) Duct tape was used to cover the eyes of Kerkowski and Goosay;

(6) Flex ties were used in conjunction with duct tape as a distinct method of restraint of the victims in the two incidents;

(7) The two crimes or incidents occurred in or involved the victims' residences, as opposed to their businesses;

(8) Kerkowski and Goosay were both small business owners;

(9) Goosay's jewelry store and Kerkowski's pharmacy both dealt in large sums of cash;

(10) Jewelry and prescription drugs have independent street value;

(11) The victims of the two matters were left bound as the assailants fled;

(12) Flex ties and duct tape were found or seen at both defendant's properties and/or in their vehicles.

*See id.* at 12–13.

¶ 13 While this list requires pruning of conclusory and repetitive entries, what remains nevertheless describes a crime so distinctive in method and so similar to the charged crime that proof appellees committed one tends to prove they committed the other. The evidence thus goes beyond showing mere conformity with a propensity to commit a class of crime, *to wit,* violent robbery—a purpose prohibited under Pa.R.E. 404(b)(2). Instead, the evidence shows identity—a purpose permitted under Pa.R.E. 404(b)(3)—through selection of a particular class of victim and use of idiosyncratic methods to carry out the crimes. The probative value of this strong identity evidence, moreover, outweighs its presumed potential for prejudice. As such, we agree with the Commonwealth that the "other crimes" evidence meets criteria for admission under Rule 404(b).

¶ 14 Our standard of review when the trial court has granted a motion *in limine* against the Commonwealth follows:

Our Court reviews the grant of such motion "by applying the [standard] of review appropriate to the particular evidentiary matter at issue." We note that this Court may reverse rulings on the admissibility of evidence only if it is shown that the trial court abused its discretion. Further, if in reaching a conclusion the trial court over-rides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Phillips,* 700 A.2d 1281, 1284 (Pa.Super.1997) (internal quotations omitted) (quoting *Commonwealth v. Surina,* 438 Pa.Super. 333, 652 A.2d 400, 402 (1995)). When reviewing a claim concerning the admissibility of evidence, and specifically evidence of other crimes or bad acts by a defendant, we note:

The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

*Commonwealth v. Reid,* 571 Pa. 1, 34, 811 A.2d 530, 550 (2002) (citations omitted). An abuse of discretion is not merely an error of judgment, but is rather the over-

riding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. *Commonwealth v. Carroll*, 936 A.2d 1148, 1152–53 (Pa.Super.2007), *appeal denied*, 596 Pa. 752, 947 A.2d 735 (2008). Further, "[a]n abuse of discretion may result where the trial court improperly weighed the probative value of evidence admitted against its potential for prejudicing the defendant." *Commonwealth v. Viera*, 442 Pa.Super. 348, 659 A.2d 1024, 1028, (1995) (citing *Commonwealth v. Wharton*, 530 Pa. 127, 144–46, 607 A.2d 710, 719 (1992)). When a trial court indicates its reason for its ruling, "our scope of review is limited to an examination of that stated reason." *Commonwealth v. Strong*, 825 A.2d 658, 665 (Pa.Super.2003).

¶ 15 Jurisprudence regarding the admission of other crimes and bad acts is as follows:

> Evidence of distinct crimes is not admissible against a defendant being prosecuted for another crime *solely* to show his bad character and his propensity for committing criminal acts [See Pa.R.E. 404(b)(1)]. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character.

*Commonwealth v. Horvath*, 781 A.2d 1243, 1245 (Pa.Super.2001). These other purposes include, *inter alia*, proving the identity of the person charged with the commission of the crime on trial. *Commonwealth v. O'Brien*, 836 A.2d 966, 969 (Pa.Super.2003).

■ ¶ 16 Identity as to the charged crime may be proven with evidence of another crime where the separate crimes share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant. *Commonwealth v. Novasak*, 414 Pa.Super. 21, 606 A.2d 477, 484 n. 7 (1992); McCormick, Evidence § 190 at 801–803 (4th ed. 1992). Required, therefore, "is such a high correlation in the details of the crimes that proof that a person committed one of them makes it very unlikely that anyone else committed the others." *Novasak, supra*.

¶ 17 In comparing the methods and circumstances of separate crimes, a court must necessarily look for similarities in a number of factors, including: (1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims. Remoteness in time between the crimes is also factored, although its probative value has been held inversely proportional to the degree of similarity between crimes. *See O'Brien, supra; Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1319 (1995); 1–404 Ohlbaum on the Pennsylvania Rules of Evidence at 404.22.

■ ¶ 18 Sufficient commonality of factors between the two crimes here dispels the notion that they are merely coincidental and permits the contrary conclusion that they are so logically connected they share a perpetrator. Indeed, the evidence indicates the other crime was committed according to a distinctive template which had emerged when commission of the charged crime produced a desired outcome: Select as a victim a small business owner who possesses a large stock of small, easily confiscated, and highly valuable goods that can be readily trafficked in an illicit market; engage the victim not at his place of work but at his residence, located in rural Northeastern Pennsylvania; overtake him and bind him with a combination of duct tape over his eyes and mouth, and plastic flex ties around the

wrists; and gain uncontested access to valuable goods and a store of cash. These similarities are striking. They reveal a highly identifiable method of selecting, overtaking, restraining, and robbing a victim that, when viewed in its entirety, places the same signature on the two crimes at issue.[7]

 ¶ 19 A review of Rule 404(b)(1) and relevant jurisprudence shows the other crime need not match every fact and circumstance of the charged crime before it may be used to prove identity. One difference between the crimes at issue which fails to undo the identity analysis here is that the other crime did not culminate in murder as did the charged crime. Different outcomes experienced by victims can, in some cases, be significant. Here, however, the difference becomes insignificant when one considers that Goosay, too, had been threatened with murder, and may very well have been murdered had not activation of the jewelry store security system forced his assailants to alter their plan and flee immediately.

 ¶ 20 Nor is it inconsistent with the identity analysis that the *modus operandi* here was developed first on an acquaintance, whose eventual murder was thought essential to prevent identification, before its reach was extended to an unfamiliar victim, whose murder would not necessarily be essential to prevent identification. These differences show nothing more than how a particular template evolved and was subsequently applied; they do not alter the fact that the same signature arises from both cases as to class of victim, where they were overtaken, how they were restrained, and what was taken.

 ¶ 21 Also without merit is the trial court's conclusion and Appellees' position that the eight month lapse of time between crimes renders the "other crimes" evidence too tenuous for admission. As explained *supra*, the importance of a temporal nexus between crimes declines as the similarity of the crimes increases. *See Commonwealth v. Clayton*, 506 Pa. 24, 33, 483 A.2d 1345, 1349–50 (1984) (attempted murder properly admitted at trial for murder committed three months earlier where crimes were strikingly similar in geographic location, motivation to rob drug-dealing victims, and method of executing crime); and *Miller, supra* (evidence of rape and attempted murder of woman oc-

7. As the "other crimes" evidence is admissible to prove identity through a signature style, there is no need to address whether physical evidence recovered from the other crime, by itself, proved identity as well. It bears noting, however, that the strongest connection forensic testing could make between the duct tape and flex ties used in each crime was that they "could have been" from the same source. Given this result, the trial court properly determined that forensic tests alone could not support admitting the "other crimes" evidence for the purpose of showing identity. However, this is not to say the forensic tests disproved identity, or, for that matter, even made it less likely that the same perpetrator committed both crimes. Quite to the contrary, the test results are relevant evidence in that they make it more probable that the two crimes share a common perpetrator.

For example, forensic tests were performed on duct tape samples from the crime scenes and from other sources. Results indicated that the only samples that "could have come" from the same source were the samples taken from the two crime scenes. This result tends toward proving identity. That other samples from the crime scenes did not share a common source, moreover, is consistent with evidence that each crime was committed by multiple perpetrators, only one of whom brought the same roll to both crimes.

Similarly tending toward identity are the test results with respect to the flex ties. While flex ties are commercially available in a variety of lengths, colors, and strengths, the ties recovered from both crime scenes were found to be identical in these features.

curring five years after two rapes and murders in question properly admitted to show identity through common scheme, plan, or design of luring similar type victims in vehicle, taking them to remote areas for sex against will, and beating them afterward with intent to kill). Even assuming for the sake of argument that an eight month lapse between crimes generally suggests different perpetrators, that suggestion is rebutted by the strong similarities between the two cases.

¶ 22 Moreover, evidence of the charged crime describes an act committed not precipitously but with calculation. Taking time to select someone whose profile fit the model that had emerged from the charged crime is in keeping with the deliberate—albeit brutal and horrific—method of carrying out the charged crime. In short, the eight month period between crimes does not weaken their strong logical connection to each other.

¶ 23 The inquiry into admissibility of "other crimes" evidence does not end with confirming a permissible 404(b) purpose such as proving identity, but proceeds to ask whether the probative value of the "other crimes" evidence outweighs its presumptive prejudice. See O'Brien, supra. In conducting the probative value/prejudice balancing test, courts must consider factors such as the strength of the "other crimes" evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and "the degree to which the evidence probably will rouse the jury to overmastering hostility." McCormick, Evidence § 190 at 811 (4th ed. 1992). See also Commonwealth v. Frank, 395 Pa.Super. 412, 577 A.2d 609 (1990) (enumerating balancing test factors, including ability for limiting instruction to reduce prejudice).

¶ 24 Applying the factors here clearly strikes a balance in favor of admission. Great probative value of the "other crimes" evidence derives from both the striking similarities between the crimes, as already described supra, and strong identification evidence as to the commission of the other crime. Two eyewitnesses—the victim and Weakley—have identified appellees as the perpetrators, and physical evidence recovered from the scene corroborates their accounts. While the evidentiary need for "other crimes" evidence in prosecuting the charged crime may seem modest given what appears to already be a considerable sum of Commonwealth evidence, one point bears emphasis: the evidence upon which the prosecution is based is largely circumstantial, and it is the specific purpose of the "other crimes" evidence to give the jury insight into the significance of these circumstances.

¶ 25 While the potential for prejudice, meanwhile, can be great when "other crimes" evidence is calculated to inflame the jury's emotions of sympathy or hostility, the potential is mitigated where, as here, the focal point of the evidence is the precise criminal method used. To be sure, the other crime involves an intense episode very much in the nature of the charged crime—as it must to have probative value. When viewed either on its own facts or in the context of a charged crime alleging death by strangulation and multiple macabre burials, however, the "other crimes" evidence as to methods of selecting, ambushing, restraining, and robbing a victim—who managed to survive in relatively good health—cannot be presumed to rouse the jury to overmastering hostility.

¶ 26 For the foregoing reasons, we deem the "other crimes" evidence admissible to prove identity under the strict criteria of Rule 404(b). The evidence reveals a signature modus operandi whose probative value outweighs the potential for prejudice.

¶ 27 Order reversed. Case remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

¶ 28 FITZGERALD, J. FILES A DISSENTING OPINION.

Dissenting Opinion by FITZGERALD, J.:

¶ 1 In reversing the trial court's well-reasoned order and opinion, the learned majority conducts a plenary review of the facts, rather than reviewing the decision for abuse of discretion as our standard of review requires. There is substantial support for the trial court's finding that the relevant crimes were not sufficiently similar to warrant their admission as evidence in the instant trial. Hence, I dissent.

¶ 2 I re-emphasize that this Court may reverse the trial court's rulings on the admissibility of evidence only if the trial court abused its discretion. *See Commonwealth v. Phillips*, 700 A.2d 1281, 1284 (Pa.Super.1997). Even if a court finds the evidence in question relevant, we must also review, under the abuse-of-discretion standard, whether its prejudicial impact renders the evidence inadmissible. *Commonwealth v. Reid*, 571 Pa. 1, 34, 811 A.2d 530, 550 (2002). It is well-settled that a mere error of judgment does not constitute abuse of discretion; rather, the court's judgment must be manifestly unreasonable or the result of bias, prejudice, ill will, or partiality. *Commonwealth v. Carroll*, 936 A.2d 1148, 1152–53 (Pa.Super.2007), *appeal denied*, 596 Pa. 752, 947 A.2d 735 (2008). The trial court's reasoning displays none of these characteristics.

¶ 3 The majority describes the crimes as "so distinctive" and "so similar" that the similarities between them are "striking." *See* Majority Op. at 1188–89. The twelve purported similarities, as posited by the Commonwealth, therefore bear repeating:

(1) Both crimes were allegedly committed by Selenski and co-defendant Weakley;

(2) Flex ties found on the bodies of the homicide victims were visually, instrumentally, and steromicroscopically similar to those removed from Samuel Goosay, the victim of the subsequent robbery;

(3) Flex ties were used to bind the hands of Kerkowski and Fassett in the homicides, and used to bind the hands of Goosay in the robbery.

(4) Duct tape found on the body of the homicide victim Kerkowski was visually, instrumentally and stereomicroscopically similar to the tape removed from Goosay, the robbery victim;

(5) Duct tape was used to cover the eyes of Kerkowski and Goosay;

(6) Flex ties were used in conjunction with duct tape as a distinct method of restraint of the victims in the two incidents;

(7) The two crimes or incidents occurred in or involved the victims' residences, as opposed to their businesses;

(8) Kerkowski and Goosay were both small business owners;

(9) Goosay's jewelry store and Kerkowski's pharmacy both dealt in large sums of cash;

(10) Jewelry and prescription drugs have independent street value;

(11) The victims of the two matters were left bound as the assailants fled;

(12) Flex ties and duct tape were found or seen at both defendant's properties and/or in their vehicles.

*See id.* at 1188.

¶ 4 We may obviously disregard the first reason proffered by the Commonwealth, since the purpose in admitting the Goosay evidence is precisely to establish that Appellees committed the instant crimes. Ad-

ditionally, the remaining "similarities" are, as the majority accurately describes them, "conclusory and repetitive entries." Majority Op. at 1188. The only way the trial court could have erred in its decision, therefore, is if the following evidence proves a common plan or scheme: (1) similar-but-common duct tape used; (2) similar-but-common flex ties used; (3) the victims were business owners who dealt with items that had independent street value; and (4) the victims were targeted at home, rather than at their place of business.

¶ 5 The common plan or preparation exceptions, or *modus operandi*, require "such a **high** correlation in the details of the crimes that proof that the defendant committed one makes it **very** unlikely that anyone else but the defendant committed the others." *Commonwealth v. Morris*, 493 Pa. 164, 176, 425 A.2d 715, 721 (1981) (emphases added). The existence of a common scheme is relevant to establish any element of a crime, including identity, "so long as it does not merely indicate the defendant's propensity to commit similar crimes." *Commonwealth v. Bronshtein*, 547 Pa. 460, 478, 691 A.2d 907, 915–16 (1997). A comparison of the crimes must establish a logical connection between them. *Commonwealth v. Hughes*, 521 Pa. 423, 459, 555 A.2d 1264, 1283 (1989). Where it is contended that a distinctive *modus operandi* exists between the two crimes, it must be shown that the crimes are "so nearly identical in method as to earmark them as the handiwork of the accused." *Commonwealth v. Rush*, 538 Pa. 104, 113, 646 A.2d 557, 561 (1994) (quoting McCormick, *Evidence*, § 190 (2d ed. 1972)). A sufficient *modus operandi* may exist "where crimes of the accused [are] so nearly identical in method as to earmark them as the handiwork of the accused.... **More is demanded [than] the mere repeated commission of crimes of the same class,** such as repeated burglaries or thefts. The device used must be

so unusual or distinctive as to be like a signature." *Commonwealth v. Blady*, 298 Pa.Super. 82, 444 A.2d 670, 671–72 (1982) (emphasis added) (quoting McCormick, *Evidence*, § 190 at 449 (2d ed. 1972)).

¶ 6 The trial court accurately noted, "There is nothing in the facts of either the Goosay robbery or the Kerkowski/Fassett homicides that involves any distinctive skill or ability. The Goosay break-in was a garden variety forced entry and it appears that the perpetrators(s) of the Kerkowski/Fassett disappearance and murder were invited in.... The Goosay robbery is not admissible to show that [Appellees] had an unusual or distinctive opportunity to murder Michael J. Kerkowski and Tammy Fassett." Trial Ct. Op. at 25 (emphasis omitted). The trial court's evaluation of the separate, proffered similarities and its comments on each proffered similarity mirrored this Court's analysis of purported similarities in *Commonwealth v. Robinson*, 361 Pa.Super. 87, 521 A.2d 940 (1987), and reflected its commitment to determining whether there was a "high correlation in the details" of the two crimes. *See id.* at 941–42. In discussing the purported similarities, the trial court commented on the relative strength of that particular similarity.

¶ 7 Instead of analyzing whether the trial court's judgment was manifestly unreasonable, or the result of bias, ill will or partiality, the majority instead offers its own evaluation of the crimes:

Select as a victim a small business owner who possesses a large stock of small, easily confiscated, and highly valuable goods that can be readily trafficked in an illicit market; engage the victim not at his place of work but at his residence, located in rural Northeastern Pennsylvania; overtake him and bind him with a combination of duct tape over his eyes and mouth, and plastic flex ties around

the wrists; and gain uncontested access to valuable goods and a store of cash. These similarities are striking. They reveal a highly identifiable method of selecting, overtaking, restraining, and robbing a victim that, when viewed in its entirety, places the same signature on the two crimes at issue.

Majority Op. at 1189–90. In my view, the majority's description offers no such signature; rather, the majority's description would accurately assess many robberies that occur, even in rural Northeastern Pennsylvania. I am unable to conclude that only a select few robbers would target a small business owner who sells readily trafficked items, invade that owner's home in a remote area, use duct tape and flex ties to bind and gag the victim, and gain easy access to the goods and cash. Such a finding seems to constitute a refusal to acknowledge that many robbers develop a plan before performing their crime.[1] What the majority describes is a robbery with a careful plan; it does not describe a signature. Though the majority hastily adds that Goosay had also been threatened with murder and a security alarm caused the perpetrators to flee, I again do not find it unusual that a robber threatened a victim with murder and fled upon hearing an alarm.[2]

¶ 8 I also disagree with the majority's analysis of the eight-month lapse between the crimes. While I agree that the lapse is not dispositive, such a conclusion goes both ways. The eight-month lapse is but a factor, and the trial court appeared to consider it a rather minor factor. Rather, the trial court focused on the lack of similarities between the victims, the location of the crimes, and Appellees' relationships with the respective victims. Thus, its mere consideration of the time period, as a single factor among many factors, was appropriate. Just as the majority concludes that the eight-month lapse may indicate a careful and prudent approach to the robberies, the trial court was also permitted to find that the eight-month lapse was not helpful to proving the crimes' similarities.

¶ 9 The trial court quoted our Supreme Court in stating, "The similarities here do not show a common thread or signature. They are merely coincidentally and not logically connected. What was not shown here was a common *modus operandi*...." Trial Ct. Op. at 27 (quoting *Commonwealth v. Hawkins*, 534 Pa. 123, 129, 626 A.2d 550, 553 (1993)). The trial court evaluated the evidence proffered regarding the flex ties and duct tape used in the two crimes and found that, at most, the similarities were generic. The expert lab report submitted by the Commonwealth indicated that some of the samples submitted " 'could [have originated,]' not did," from the same manufacturers, while other samples did not share a common source or origin. Trial Ct. Op. at 28 n. 18. The trial court also observed that "[b]oth duct tape and plastic flex ties are ubiquitous." Trial Ct. Op. at 28. The court further found that merely because "two samples of duct tape look alike ... and [ ] two plastic flex ties look alike is not unusual." *Id.* Finally, the court noted that the use of duct

---

1. Indeed, while the majority could argue that these factors "**permit** [ ] the contrary conclusion that they are so logically connected they share a perpetrator," Majority Op. at 1189 (emphasis added), they do not, in my view, **require** such a conclusion, which is necessary in order to find the trial court's decision manifestly unreasonable and therefore an abuse of discretion.

2. Importantly, the majority does not consider that while Appellees apparently befriended one of the murder victims, Kerkowski, Jr., there was no evidence that they had any kind of relationship with the robbery victim, Goosay.

tape to cover the victims' eyes and mouth, and flex ties to restrain the victims, is also not unusual. *Id.* at 29. After considering all of the evidence and circumstances as they related to the proffered "similarities," the trial court found that the similarities presented by the Commonwealth did not "demonstrate uniquely similar common features." *Id.* at 29 (emphasis omitted). As the trial court accurately notes, both duct tape and flex ties are items commonly found at hardware stores, and both are commonly used to restrain or muzzle victims. This is a point not contested by the majority, other than to opine that the forensic tests did not **disprove** identity. Majority Op. at 1190 n. 7. As such, the majority seems to flip the burden of proof, requiring Appellees to prove why easily available and commonly used duct tape and flex ties are not signature items, rather than requiring the Commonwealth to prove why using these items could only have meant that Appellees were involved.[3]

¶ 10 I must note that this is not a case where the evidence would be used to impeach a witness or to rebut inferences favorable to the defendant. *See Commonwealth v. Saxton,* 516 Pa. 196, 207, 532 A.2d 352, 357 (1987) (admitting evidence of a prior firearm conviction where a defendant testified that he "never owned a gun"). Perhaps more pertinently, this is not a case where the same gun was used in two crimes. *Compare with Commonwealth v. Terrell,* 234 Pa.Super. 325, 339 A.2d 112, 114 (1975) (finding admissible the defendant's subsequent arrest with a

particular firearm in prosecution for committing a crime with a firearm); *Commonwealth v. Nolen,* 390 Pa.Super. 346, 568 A.2d 686, 689 (1989) (finding admissible the defendant's burglary in which he stole a gun during the prosecution of a subsequent homicide with the same gun). Thus, in the instant case, identity cannot be proven by the use of a unique instrument, as flex ties and duct tape are simply too generic to render such a finding.

¶ 11 Finally, in performing the balancing test required by Pa.R.E. 404(b)(3), I find that the trial court properly concluded admission of the Goosay-robbery evidence would unfairly divert the jury's attention to a remote and wholly collateral incident and raise the likelihood that Appellees would be deprived of an "unclouded determination" of the instant charges. Trial Ct. Op. at 33, (citing [*Commonwealth v.]* Hude,* 256 Pa.Super. 439, 390 A.2d [183,] 186 (1978)). The Commonwealth offers little argument to counter the trial court's thorough analysis, particularly concerning the ease by which anyone may obtain similar flex ties and duct tape, and the common usage of each. Accordingly, the trial court properly employed the balancing test as set forth in Pa.R.E. 404(b)(3), and did not abuse its discretion in applying the test to the facts and circumstances of the within case.[4]

¶ 12 In conclusion, the trial court filed a comprehensive opinion in which its reasoning is supported amply by the record. It properly concluded that the Common-

3. Such a finding would therefore require trial courts always to admit evidence that, *e.g.:* (1) red Sherwin–Williams paint was used to vandalize homes in two different vandalism cases; or (2) regular-unleaded Sunoco gasoline was used to set fire to a house in two different arson cases.

4. The learned majority cites as compelling evidence the fact that Goosay and Weakley identified Appellees as the perpetrators of the Goosay robbery. Majority Op. at 1191. It is precisely this direct identification evidence, easily apparent in the Goosay robbery but absent from the Kerkowski and Fassett murders, that provides much of the prejudicial impact of admitting evidence of the Goosay robbery.

wealth failed to prove the Goosay robbery was unlike many other robberies that turn violent. It also weighed the probative value of the evidence, which it found to be minimal, with the overwhelming prejudicial value of the evidence.[5] Instead of conducting a plenary analysis of the facts with an eye toward reversing the trial court, I would review the trial court's decision to determine if there is any basis for affirming it. Because I find the trial court's decision easily supported by the record, I respectfully dissent.[6]

**5.** I emphasize our Rules of Evidence make it clear that evidence of other crimes is **presumptively** prejudicial unless a listed exception applies. It matters not, in my opinion, whether "the focal point of the evidence is the precise criminal method used," as the majority states. *See* Majority Op. at 1191. Instead, the trial court has the discretion to exclude evidence if it finds that the probative value is outweighed at all by "the danger of unfair prejudice." Pa.R.E. 403; *see also* Pa.R.E. 403, *Comment* (observing that Pennsylvania Rule 403 differs from Federal Rule of Evidence 403 in that the federal rule requires the probative value to be "substantially outweighed," while the Pennsylvania rule requires that the probative value be "outweighed," in conformity with Pennsylvania law).

**6.** Moreover, I have substantial doubts that excluding evidence of the Goosay robbery substantially handicaps the Commonwealth's prosecution of Appellees, as it appears to have plenty of other evidence by which to prosecute them. However, I acknowledge that we may be unable to review the Commonwealth's good-faith certification. *See Commonwealth v. White,* 589 Pa. 642, 653–54, 910 A.2d 648, 654–55 (2006); *Commonwealth v. Cosnek,* 575 Pa. 411, 420–21, 836 A.2d 871, 877 (2003).