J-S56006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ANTHONY CAIBY | |
| Appellant | No. 3145 EDA 2016 |

Appeal from the Judgment of Sentence April 6, 2016
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0002035-2013

BEFORE:  BOWES, STABILE, AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.:                **FILED NOVEMBER 21, 2017**

Anthony Caiby appeals from the judgment of sentence of life in prison without the possibility of parole, plus a consecutive sentence of forty-two to eighty-four months incarceration, imposed after he was convicted of first degree murder, two counts of criminal conspiracy, tampering with physical evidence, abuse of a corpse, and possession with intent to deliver ("PWID"). We affirm.

At approximately 4:30 p.m. on October 8, 2005, the victim, David McEntire, left his home.  His family never saw him again.  Mr. McEntire's disappearance remained a mystery until 2009, when Lisa Stavish was arrested for retail theft.  Ms. Stavish intimated to her arresting officer specifics of a murder of a man named "David."  Ms. Stavish offered details of

_____

*  Retired Senior Judge specially assigned to the Superior Court.

the event, and stated that she witnessed Edwin Kelly, James Gaines, and Appellant attack and kill the victim in Mr. Kelly's house. Based on the information provided by Ms. Stavish, investigators executed a search warrant on Mr. Kelly's residence. At that time, Mr. Kelly agreed to speak with police. Thereafter, Mr. Kelly confessed to his participation in Mr. McEntire's murder and corroborated specific details of the incident recounted by Ms. Stavish, that were not made public, including that they had returned the victim's van to his place of work, left the keys in the ignition, and locked the doors.

At the time of his death, Mr. McEntire was addicted to crack cocaine. Appellant sold the victim cocaine during the month preceding the attack, and used Mr. Kelly's house to distribute the illicit substance. On October 8, 2005, Appellant lured the victim to Mr. Kelly's residence. When the victim entered the living room, Appellant bludgeoned him in the head with the claw end of a hammer. The assailants then moved the victim to the basement where he was shot in the legs four times with a .22 caliber rifle. Ms. Stavish administered Mr. McEntire two "hot shots," an injection of bleach and cocaine, using cocaine provided by Appellant. Following the second injection, the victim died. After Mr. McEntire perished, the conspirators burned his body in a fire pit behind the house, and disposed of the remaining bones near a junkyard in West Hazelton, Luzerne County. His remains were never recovered.

Based on the foregoing, Appellant was charged with the aforementioned offenses. Prior to trial, Ms. Stavish and Mr. Kelly reached plea agreements with the Commonwealth, agreeing to plead guilty to third-degree murder in exchange for their testimony against Appellant. They each received a sentence of seven to twenty years incarceration following their pleas. Also prior to trial, the Commonwealth filed a notice of its intent to introduce evidence of other crimes, wrongs, or acts pursuant to Pa.R.E. 404(b). After a hearing on the matter, the trial court permitted the Commonwealth to introduce evidence that Appellant was subsequently arrested for assault and drug dealing, as well as evidence of another assault he participated in at Mr. Kelly's residence, which was never reported to the police. It ruled other proposed prior bad acts evidence was inadmissible.

Following a jury trial, Appellant was found guilty of first-degree murder, conspiracy to commit first-degree murder, PWID, conspiracy to commit PWID, abuse of a corpse, and tampering with physical evidence. The trial court imposed a sentence of life in prison without the possibility of parole on the first-degree murder conviction and a consecutive sentence of forty-two to eighty-four months incarceration for PWID. Appellant filed a post-sentence motion, which the trial court denied, and filed a timely notice

of appeal to this Court.[1]   Appellant and the trial court complied with

Pa.R.A.P. 1925, and this matter is now ready for our review.

Appellant raises five questions for our consideration:

1. Did the lower court err in finding sufficient evidence to support the jury verdict of First Degree Murder when the Commonwealth failed to establish [Appellant] committed murder or acted with any specific intent to kill?

2. Did the lower court err in finding sufficient evidence to support the verdict regarding [PWID] when the Commonwealth failed to present any evidence that [Appellant] possessed or constructively possessed a controlled substance and did so with the intent to deliver it?

3. Did the lower court err in denying [Appellant's] request for a new trial when the jury's verdict was against the weight of the evidence and is so deficient as to shock one's sense of justice?

4. Did the lower court err in denying [Appellant's] request for a new trial for prosecutorial misconduct during closing remarks?

5. Did the lower court err in denying [Appellant's] pretrial motion regarding notice of 404(b) other crimes evidence thereby permitting the Commonwealth to introduce prejudicial bad act evidence?

Appellant's brief at 4.

Appellant's first two issues challenge the sufficiency of the evidence

underpinning his convictions for murder in the first degree and PWID.   We

---

[1] After trial, Appellant's trial counsel was permitted to withdraw.  The trial court appointed current counsel, who filed an amended post-sentence motion, and represents Appellant on this appeal.

consider them together. We utilize the following standard when reviewing a challenge to the sufficiency of the evidence:

> Whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Fitzpatrick**, 159 A.3d 562, 567 (Pa.Super. 2017) (citation omitted).

The Crimes Code defines murder, in pertinent part, as an "intentional killing." 18 Pa.C.S. § 2502(a). To convict a person of first-degree murder, the Commonwealth must establish: "(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." **Fitzpatrick**, **supra** at 567 (brackets and citation omitted). A killing is intentional if it is done in a "willful, deliberate and premeditated fashion." 18 Pa.C.S. § 2502(d). However,

- 5 -

[t]he period of reflection needed to establish deliberation and premeditation may be as brief as a fraction of a second. Indeed, the deliberation and premeditation needed to establish intent exists whenever the assailant possesses the conscious purpose to bring about death. The Commonwealth may use circumstantial evidence to establish the elements of first-degree murder, including the element of intent.

*Id*. (citing *Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009) (internal citations omitted)). Finally, "[w]hen there is no direct evidence of intent to kill, the fact-finder may glean the necessary intent from the act itself and from all surrounding circumstances." *Id*. (citation omitted). As such, "[s]pecific intent to kill can be proven when the defendant knowingly applies deadly force to the person of another." *Id*. (emphasis omitted).

Appellant contends there was insufficient evidence that he "planned or perpetrated the killing of the victim." Appellant's brief at 22. He concedes that he participated in disarming and assaulting the victim, who arrived at Mr. Kelly's house bearing a shotgun, but argues that he did not act with malice or a specific intent to kill. He maintains that Ms. Stavish administered the hot shots which ultimately killed Mr. McEntire. As such, he concludes the evidence does not establish that he committed murder in the first degree.

Instantly, Ms. Stavish testified that Appellant and Mr. Kelly suspected the victim of being involved in the theft of $1500 and an ounce of cocaine from Mr. Kelly. When the victim arrived at Mr. Kelly's house, "there was a lot of yelling going on and [Appellant] struck him over the head with a

- 6 -

hammer, the claw end and he was bleeding profusively [sic][.]" N.T., 1/8/16, at 151-152. She stated that this attack occurred "right in the opening to a living room of the house," and involved "[Appellant], [Mr.] Kelly and [Mr. Gaines] all kicking him." *Id*. at 152; 161. After this attack, Ms. Stavish continued, the assailants dragged Mr. McEntire to the basement, and subsequently, she "heard about three or four gunshots go off." *Id*. She noted that, following the victim's death, they dropped his van off at his workplace, burned his body, and disposed of the remains in a remote area of Hazleton. *Id*. at 154-156.

Mr. Kelly corroborated much of Ms. Stavish's testimony. He observed that the victim arrived at his house carrying a shotgun.[2] N.T., 1/11/16, at 15. Mr. Kelly stated that he, Appellant, and Mr. Gaines took the weapon from Mr. McEntire and "proceeded to give him a beating." *Id*. At that point, Mr. Kelly left the residence to conduct a drug transaction. However, when he returned, the victim had been moved to the basement, and Mr. Kelly heard gunshots which originated from that location. Mr. Kelly testified that

---

[2] The record suggests that the victim brought the shotgun to Mr. Kelly's house not to defend himself, but rather, to trade for drugs. This theory is bolstered by evidence that Mr. McEntire had exhausted his financial resources, and that he may have traded another firearm to Appellant at some point. Shortly after the victim's death, his wife reported to police that her personal firearm was missing. That firearm was later recovered in Brooklyn, New York, within one-half mile radius of an apartment complex linked to Appellant and Mr. Gaines.

Ms. Stavish injected the victim with a hot shot of "coke and bleach," and that Appellant provided the cocaine. *Id*. at 15, 25. After the victim died, he stated that "[the victim] was taken out to my burn pit in a carpet, gas poured on him and he was burned." *Id*. at 15.

In addition to this testimony, the Commonwealth offered forensic evidence collected during the search of Mr. Kelly's residence. Trooper John Corrigan testified that there was evidence of blood located throughout the house, including in the living room, in the basement stairs, and in the basement. N.T. 1/8/16, at 75, 78-93. The trooper observed that there was evidence of an attempt to clean the crime scene, such as shampooing the carpet and painting the walls. The investigation also uncovered blood specks on ceiling beams in the living room that were "consistent with a blood shedding event such as a beating." N.T., 1/11/16, at 147. Further, the Commonwealth proffered the victim's phone records, which revealed that Appellant was the last person to contact the victim prior to his disappearance.

When viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we find that the Commonwealth proffered sufficient evidence to prove that Appellant committed first-degree murder beyond a reasonable doubt. Appellant conceded that Mr. McEntire was dead. N.T., 1/13/16, at 20. In addition, the evidence and testimony provided by the Commonwealth established that Appellant lured Mr.

McEntire to Mr. Kelly's house. When the victim arrived, Appellant hit him in the head with a hammer, causing severe bleeding, establishing that he applied deadly force to a vital part of the victim's body. ***Rivera***, ***supra***; ***Commonwealth v. Fortson***, 165 A.3d 10, 16 (Pa.Super. 2017) (noting jury may infer specific intent to commit murder from attack on vital part of victim's body). Further, Mr. Kelly's testimony indicated that Appellant provided the cocaine used in the hot shot injections, which ultimately led to the victim's demise. Moreover, the testimony revealed that the conspirators attempted to cover up their crime by returning Mr. McEntire's van, burning and disposing of the body, and cleaning up the crime scene. When considering this evidence together, we find that it supports the conclusion that Appellant deliberately assaulted the victim, and participated in the actions which led to his death, with the specific intent to kill him. Hence, no relief is due.

Next, Appellant challenges his conviction for PWID. The Crimes Code prohibits, in relevant part, "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act[.]" 35 Pa.C.S. § 780-113(a)(30).

Appellant argues that the only evidence adduced to support this conviction was "general character testimony that [he was] a known drug dealer." Appellant's brief at 19. He concedes that the Commonwealth offered evidence that Ms. Stavish made drug deliveries on his behalf, that

Mr. Kelly sold cocaine with him for eight years, and that other witnesses testified that they bought drugs from him. *Id*. Nevertheless, he claims that there "was no specific evidence that [Appellant] possessed or constructively possessed any particular drug at any particular point in time[.]" *Id*.

We find that Appellant's argument is belied by the record. Numerous witnesses testified that they had purchased drugs from Appellant. For example, Heather D'Auria stated that she purchased crack from Appellant. N.T., 1/7/16, at 179-180. Jessica Bajwa confirmed that she bought cocaine from Appellant. N.T., 1/8/16, at 113. Danielle Joye, Appellant's former girlfriend, stated that she witnessed Appellant sell drugs. *Id*. at 146. Mr. Kelly offered testimony as to the extent of Appellant's drug operation, in which he was a participant. N.T., 1/11/16, at 6-11. He specifically noted that Appellant regularly sold crack cocaine to the victim. *Id*. at 13. The jury could have reasonably inferred from Mr. Kelly's testimony that the victim traveled to Mr. Kelly's residence on the day in question with the intent to purchase cocaine from Appellant. In addition to Appellant's own admissions, we find that the Commonwealth offered sufficient evidence that he possessed an illegal narcotic with the intent to deliver it. No relief is due.

Appellant's third issues assails the trial court's denial of his challenge to the weight of the evidence underlying his convictions. Our standard of review is well-settled:

- 10 -

When we review a weight-of-the-evidence challenge, we do not actually examine the underlying question; instead, we examine the trial court's exercise of discretion in resolving the challenge. This type of review is necessitated by the fact that the trial judge heard and saw the evidence presented. Simply put, one of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice. A new trial is warranted in this context only when the verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Konias*, 136 A.3d 1014, 1022 (Pa.Super. 2016) (citations, internal quotation marks, and brackets omitted).

Appellant's argument in this regard is fairly straight-forward. He asserts that the only evidence of his involvement in Mr. McEntire's murder was provided by Ms. Stavish and Mr. Kelly. Appellant highlights that these individuals provided testimony against him in exchange for favorable plea agreements. In addition, Appellant posits that the evidence supports a finding that those two individuals committed the homicide, without conclusively revealing Appellant's role in the incident.

In determining that the verdict was not against the weight of the evidence, the trial court noted that the testimony of Ms. Stavish and Mr. Kelly alone supported the verdict. Trial Court Opinion, 12/16/16, at 21. However, it observed that the Commonwealth proffered additional evidence consistent with that testimony. The trial court recognized that Ms. Stavish and Mr. Kelly "were classic 'corrupt and polluted sources,'" but emphasized

- 11 -

that the jury was well aware of their status and was properly instructed on how to view their testimony. It highlighted that defense counsel also "hammered the point home in his cross-examinations of both witnesses and in his closing." *Id*. at 22. The trial court observed that, even with the knowledge of the witnesses' plea deals, "[t]he jury chose to believe them anyway." *Id*. The court concluded that the verdict did not shock the conscience. Since the trial court applied the proper legal standing in rejecting Appellant's claim, we find no abuse of discretion. Hence, the jury's verdict does not shock the conscience, and this claim fails.

Appellant's fourth issue assails the trial court's denial of his motion for a mistrial premised upon the prosecutor's purported misconduct during closing remarks. We observe,

> [n]ot every unwise remark made by an attorney amounts to misconduct or warrants the grant of a new trial. Comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Collins*, 70 A.3d 1245, 1252-1253 (Pa.Super. 2013) (citation omitted). In addition,

> [i]n determining whether the prosecutor engaged in misconduct, courts must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing. A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel.

*Id*. at 1253 (citation and brackets omitted).

The following statements made during summation are relevant to our

analysis:

> Defense Counsel: And one thing that I thought was pretty important – and I thought we would hear DNA evidence – is you heard evidence about how these people supposedly took all of these efforts to clean up blood and shampoo rugs; and again they were able to shampoo the top of the rug but it looks like there was blood underneath the rug, but there was some pristine DNA samples or potential DNA samples that were on the beams and I thought for sure that we were going to hear evidence that that blood was Mr. McEntire's blood because you could tell that if that's the evidence that while the people may have been good at cleaning around the walls and the floors they missed up there. We didn't hear that evidence.

N.T., 1/13/16, at 56.

> Prosecutor: Now in this case police generated reports, charges were filed. I mean hundreds and hundreds of police reports, lab reports get sent to the defense – hundreds and hundreds of pages. Everything we got they get. That's called discovery. That's so the defense can prepare and they can read the charges.
>
> So when the defense is up here and saying I was expecting to see DNA, I was expecting to see DNA here or there; he knew there were insufficient quantities of DNA. That's a hyperbole.
>
> One of the instructions you're going to hear from the Court is that the Commonwealth doesn't have to produce the body because otherwise the guy that gets rid of the body totally will never ever be found guilty of murder.
>
> The Commonwealth does not have to produce any part of a body including DNA. You've got proof that the victim died, proof that it was by criminal means and frankly the defense has conceded in the closing argument that Stavish and Kelly killed the man.

> So if you make that concession than you really can't – you really can't quibble about whether or not there's DNA evidence. We know that a significant amount of blood was shed right there (indicating); the luminol shows us that.

*Id*. at 102-103.

Appellant argues that the prosecutor's statements during closing prejudiced the jury by implying that the defense bore the burden of producing a DNA expert, and that they failed to meet this burden. He contends that, since neither the prosecution nor the defense called a DNA expert, these comments created bias against the defense. We disagree.

We find that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial based on the prosecutor's remarks. We do not agree that the prosecutor's statements imply that the defense bore any burden with regard to producing a DNA expert. Rather, the prosecutor's comments fairly responded to the defense counsel's statements during summation. The defense openly questioned why the prosecutor did not present DNA evidence, despite evidence of bloodshed within Mr. Kelly's house. The prosecution explained that, although they discovered evidence of significant blood-letting within the house, the samples recovered were not suitable for DNA testing. Such an explanation was a fair response to the defense's open question, and thus, it was an appropriate response in the context of the closing. ***Collins***, ***supra***. No relief is due.

Finally, Appellant asserts that the trial court abused its discretion by permitting the introduction of prejudicial evidence of his prior bad acts. A trial court's evidentiary rulings are afforded great deference. As such, "[w]e give the trial court broad discretion, and we will only reverse a trial court's decision to admit or deny evidence on a showing that the trial court clearly abused its discretion." *Commonwealth v. Talbert*, 129 A.3d 536, 539 (Pa.Super. 2015) (citation omitted). An abuse of discretion "is not merely an error in judgment, but an overriding misapplication of the law, or the exercise of judgment that his manifestly unreasonable, or the result of bias prejudice, ill-will or partiality, as shown by the evidence of record." *Id*.

We have long understood that,

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that the defendant acted in conformity with those past acts or to show criminal propensity. However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. In determining whether evidence of prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

*Commonwealth v. Sitler*, 144 A.3d 156, 163 (Pa.Super. 2016) (citation omitted); Pa.R.E. 404(b).

The trial court permitted the Commonwealth to offer evidence of an unreported assault Appellant allegedly committed in August 2008, and an

- 15 -

arrest for domestic violence on April 1, 2006. The trial court described the incidents as follows:

> The Commonwealth seeks to admit evidence of an assault that occurred on or about August 29, 2008, when [Appellant] along with accomplices Kelly and an unidentified African-American male, assaulted a 26 year-old Caucasian male named Michael Librizzi as a result of a drug-related dispute. The beating caused Mr. Librizzi to suffer a facial fracture, various other head trauma, and a broken leg.
>
> . . . .
>
> The Commonwealth intends to introduce facts relating to an April 1, 2006 arrest in which [Appellant] was arrested by Pocono Township police following a violent domestic altercation with his girlfriend, Danielle Joye . . . [W]hile fleeing the scene, [Appellant] discarded cocaine and drug paraphernalia. In addition, when ultimately apprehended, he had large sums of money on him. During the ensuing investigation, Ms. Joye provided her cell phone number to police. The Commonwealth represents that several witnesses will testify they used that number to contact [Appellant] to buy drugs, that many calls were made to that number from the victim's phone, and that the last call made on the victim's phone was an outgoing call to that number.

Trial Court Opinion, 2/6/15, at 18, 22-23.

With regard to the unreported assault on Michael Librizzi, the trial court, relying on *Commonwealth v. Weakley*, 972 A.2d 1182 (Pa.Super. 2009), permitted the Commonwealth to introduce this evidence to identify Appellant's participation in Mr. McEntire's murder and, additionally, to establish Appellant's motive. Employing the analysis pertinent to the identity exception enunciated in *Weakley*, it noted that "the motive, manner of execution, and location of the two crimes are the same," and that "at

- 16 -

least two of the same actors are implicated in both crimes." Trial Court Opinion, 2/6/15, at 19-20. Since the Commonwealth intended to prove that the victim was Appellant's customer, and Appellant believed he stole money and drugs from him, the assault on Mr. Librizzi, the court found that the incident was probative of his motive for the killing. Further, the court found the probative value of the proffered evidence outweighed its prejudicial effect since "the events surrounding [the victim's] murder and the beating of Mr. Librizzi possess a high degree of similarity, drug trafficking is the reason and motive for both the murder and the assault on Librizzi, the time lapse between events is not great, especially when the evidence is viewed as a chain and sequence of events, and the evidence provides history and context." *Id*. at 25.

With regard to the subsequent arrest on April 1, 2006, the court limited the Commonwealth to presenting evidence "regarding [Appellant's] continuous drug dealing, especially out of Kelly's residence, the methods and locations of his operation, and the discarding of drugs when fleeing from police." *Id*. at 24. It observed that this evidence was "probative of identity and motive[.]" *Id*. As noted above, the court ruled that the probative value of this evidence outweighed its prejudicial effect. *Id*. at 25.

Appellant argues that the trial court erred in permitting this evidence. He contends that neither identity nor motive serve to justify the admission of his prior bad acts. He claims that, although the telephone number provided

by Appellant's former girlfriend, Danielle Joye, matched the last phone number to contact the victim, this alone should not justify admission of the other details of his domestic dispute arrest. Furthermore, he maintains that the assault perpetrated on Mr. Librizzi was not sufficiently similar to the attack on Mr. McEntire to prove his identity, since that crime occurred several years later, the injuries were different, and it involved different weapons. As it pertains to motive, he asserts that the bad acts in question bear no logical connection to the homicide, and were, therefore, not relevant. Appellant concludes, that "the lower court erred by allowing the Commonwealth to introduce the assault case from August of 2008 and the Domestic arrest case from April 1, 2006." Appllant's brief at 29.

Although we agree with Appellant that the prior bad acts in question were not admissible pursuant to the motive exception to Rule 404(b), we find that the trial court did not abuse its discretion in permitting the Commonwealth to present evidence of Appellant's arrest following his domestic dispute with Ms. Joye. First, the telephone number linked to Ms. Joye, who was dating Appellant at the time of Mr. McEntire's murder, was highly probative of the identity of his attacker. Mr. McEntire's phone records revealed that he made numerous calls to that phone number in the month leading up to his death, including the final phone call he made. Until Appellant was arrested on April 1, 2006, the investigators were unable to

connect that phone number to an individual, and this evidence linked Appellant to the murder victim.

Moreover, the evidence that Appellant possessed drugs, drug paraphernalia, and a large amount of cash at the time of his arrest was probative of his conduct as a drug dealer, and his relationship with the victim, who was a known crack cocaine addict. Not only was this evidence probative of Appellant's identity, insofar as it corroborated the victim's relationship with Appellant, it also supported the Commonwealth's theory that the victim died as a result of a drug-related dispute, *i.e.*, that Appellant attacked the victim because he believed the victim had stolen money and cocaine from his drug organization.

We also find the trial court did not abuse its discretion in admitting evidence regarding the assault on Mr. Librizzi. As we noted in **Weakley**, *supra*, "[i]dentity as to the charged crime may be proven with evidence of another crime where the separate crimes share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant." In determining whether a crime is sufficiently similar under this exception, we consider: "(1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) types of victims." **Weakley**, *supra* at 1189. Finally, "[r]emoteness in time between the crimes is also factored, although its

probative value has been held inversely proportional to the degree of similarity between crimes." **Id**.

Here, Mr. Kelly testified that Appellant assaulted Mr. Librizzi at Mr. Kelly's house. N.T., 1/11/16, at 40. He stated that Mr. Librizzi was a "customer," and that he lured him to the house by telling him he "needed something." **Id**. at 39, 42. Mr. Kelly attested that Appellant then physically assaulted Mr. Librizzi because "[h]e was dealing [drugs] to people he shouldn't have been[.]" **Id**. at 40. Likewise, as noted above, Appellant spoke with Mr. McEntire, who then met him at Mr. Kelly's residence. Appellant then assaulted the victim because he suspected that Mr. McEntire had stolen money and narcotics from Mr. Kelly, his partner in the drug organization. Additionally, we note that the Commonwealth proffered evidence that Appellant utilized Mr. Kelly's house as the base of his drug operation.

The attack on Mr. McEntire and the attack on Mr. Librizzi were executed in the same manner, for similar purposes, in the same location, and involved Appellant's drug customers. We find these circumstances sufficiently similar as to be probative evidence that Appellant committed both crimes. **Weakley**, **supra**. Finally, we find that the probative value of this evidence outweighs its prejudicial effect, and in any case, the trial court provided a proper jury charge explaining the limited basis for which the jury could consider this evidence, and we presume it followed that instruction.

N.T., 1/13/16, at 146, 166-167; ***Commonwealth v. Storey*** 167 A.3d 750,

758 (Pa.Super. 2017) (citation omitted).  Thus, relief is not warranted.

Judgment of sentence affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary


Date: *11/21/2017*