**[J-81-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 718 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | entered on 1/6/2015 in the Court of |
| | : | Common Pleas, Monroe County, |
| v. | : | Criminal Division at No. CP-45-CR- |
| | : | 0000391-2008 |
| | : | |
| CHARLES RAY HICKS, | : | ARGUED:  September 13, 2016 |
| | : | |
| Appellant | : | |

*Justice Dougherty delivers the Opinion of the Court with respect to Parts I, II and IV and announces the judgment of the Court.  Justices Todd and Mundy join the opinion in full.  Chief Justice Saylor joins in Parts I, II and IV and in the judgment and files a concurring opinion.  Justice Baer also files a concurrence.  Justices Donohue and Wecht file dissenting opinions, and Justice Wecht joins the merits portion of Justice Donohue's dissent.*


## OPINION


**JUSTICE DOUGHERTY**                    DECIDED:  March 28, 2017

Appellant Charles Ray Hicks appeals from the sentence of death imposed by the Monroe County Court of Common Pleas after a jury convicted him of first-degree murder, tampering with evidence, and abuse of corpse.[1]  For the following reasons, we affirm the judgment of sentence.

### I. Background

On January 29, 2008, Corporal Jody Radziewicz, a member of the forensic services unit of the Pennsylvania State Police, was called to process several crime

---

[1] 18 Pa.C.S §2502(a), 18 Pa.C.S §4910(1), and 18 Pa.C.S §5510, respectively.

scenes where body parts were discovered on stretches of Route 380 and Route 80 in Monroe and Lackawanna Counties. N.T. 11/5/14 at 91. At these various locations, troopers recovered numerous black garbage bags with blue handle ties containing the body parts of a woman, except for her hands. *Id.* at 91-93. Surprising to Corporal Radziewicz was the fact that most of the body parts were relatively cleanly severed, probably with a knife or saw, and free from blood. *Id.* at 102, 121. However, there was blood and a jagged cut in the shoulder area where the neck and head were severed from the rest of the body. *Id.* at 157. The victim's head was found on the on-ramp to Route 380 from Route 423 in Tobyhanna, Monroe County, about 200 yards from appellant's house. *Id.* at 83, 163.

Dr. Saralee Funk performed an autopsy at the Monroe County Coroner's Office, and a rape kit was also prepared; hairs, footprints, and other DNA evidence were taken from the victim. *Id.* at 198-201. The victim was eventually identified as Deanna Null after dental records were compared and determined to be a match. *Id.* at 206. Dr. Funk's autopsy report stated there were ambiguities around the timing of the injuries, and pre-death trauma could not be ruled out until additional testing was completed. N.T. 11/6/14 at 141-42. Shortly after the autopsy and before additional testing, Dr. Funk suffered a serious health crisis which led to her retirement. N.T. 11/5/14 at 206-07.

The autopsy report was later reviewed and additional testing was completed by Dr. Wayne Ross, a forensic pathologist working in multiple counties in Pennsylvania. N.T. 11/6/14 at 20. After observing marks and swelling on the victim's face, Dr. Ross concluded this was due to blunt force trauma from being hit in the face with a hand or fist at least six times while she was still alive. *Id.* at 28-33. Dr. Ross also found pre-death injuries, including lacerations, on the back of the victim's head which he determined were consistent with being struck with a crowbar or a pipe. *Id.* at 34-38. Dr.

Ross concluded the victim suffered at least seventeen different impacts to her face and head area while she was still alive as there was swelling and hemorrhaging which would not have occurred had the victim been deceased prior to the trauma. *Id.* at 44. Further pre-death injuries were found to the victim's torso, including all twelve ribs being fractured multiple times. *Id.* at 51. Dr. Ross concluded these injuries resulted from being stomped with a boot or shoe. *Id.* at 54. Dr. Ross also found evidence the victim was strangled while alive based on the red-purple appearance of her face and hemorrhaging in the throat area. *Id.* at 61-64. Using a process called "blood staining," and based on blood and blood clotting around the neck tissue, Dr. Ross concluded the victim was alive when her neck and head were severed from her torso. *Id.* at 75-90. Dr. Ross ultimately concluded the victim's cause of death was a combination of strangulation and sharp force injury to her neck. *Id.* at 90.[2]

Anthony Bullock was interviewed by police and stated the victim had brought appellant to his home in the Scranton area on or about January 25, 2008. *Id.* at 221. After staying for a few hours, appellant and the victim left Mr. Bullock's home. *Id.* This was the last time Mr. Bullock saw the victim and stated she seemed nervous and withdrawn during the visit, which was not like her normally outgoing demeanor. *Id.* at 224. Mr. Bullock stated appellant returned a few hours later looking for crack cocaine without the victim. *Id.* at 222.

Joseph McCallister was also interviewed and told police he had introduced the victim to a man who was looking for prostitutes and drugs in the Scranton area in

---

[2] Justice Donohue, in dissent, notes there was conflicting expert testimony regarding the manner of the victim's death and whether her neck injuries were pre- or post-mortem. Dissenting Opinion, Donohue J., slip op. at 22, n.11.

January of 2008. *Id.* at 173-76. McCallister gave the police a description of the man and his vehicle and also told police the man stated he worked in Tobyhanna. *Id.* at 178.

On February 7, 2008, Trooper Kent Lane was on surveillance looking for a dark colored sedan with a vinyl roof as described by McCallister. *Id.* at 148. While traveling on Route 423, near the intersection of Route 380, Trooper Lane observed a dark blue Mercury Grand Marquis parked at 131 Prospect Street, appellant's residence. *Id.* at 149. After searching the license plate number, Trooper Lane determined the owner of the vehicle was a "Charles R. Hicks," but the investigation regarding appellant was placed on hold while other leads were followed. N.T. 11/10/14 at 120. However, on March 4, 2008, Trooper Shawn Hilbert received information about the same vehicle being present at appellant's residence. N.T. 11/6/14 at 153. After further confirming Charles Hicks of Burleson, Texas was the owner of the vehicle, Trooper Hilbert called the Texas Intelligence Department which provided driver's license photographs for two men named Charles Hicks, father and son, who resided at the same address in Burleson. *Id.* at 156-57.

Police secured a search warrant for the vehicle and approached appellant in a parking lot after following his vehicle. N.T. 11/10/14 at 126. Appellant agreed to go to the police barracks for an interview. *Id.* During the interview, appellant acknowledged he knew the victim as a prostitute from Scranton and had been with her on one or two occasions in the beginning of January 2008. *Id.* at 132. Appellant also stated he was addicted to crack cocaine and had some problems with alcohol. *Id.* at 133. However, appellant denied ever becoming violent with the victim. *Id.* at 146. During the search of the vehicle, police recovered a blood-stained pair of boots from the trunk. *Id.* at 21-23, 63-64. There were also traces of blood present in the front passenger seat. *Id.* at 24. When asked about the blood on the boots, appellant stated he did not know how it got

there. *Id.* at 156. Appellant was then informed a search warrant had been secured for his home. *Id.* at 157.

Trooper Matthew Johnstone, a New York State Police dog handler, was called in to assist the Pennsylvania State Police in their search of appellant's residence and vehicle for human remains. N.T. 11/7/14 at 18-19. After there was no alert to such remains in the vehicle or the exterior of appellant's property, Trooper Johnstone moved inside the house. *Id.* at 19. The K9 alerted to a briefcase in the living room area and the floor in one corner of the basement. *Id.* at 20-21. The briefcase contained a very detailed handwritten map of the Scranton area. N.T. 11/10/14 at 172-73. Collected from the basement was a Sawzall reciprocating saw blade and medium length brown hairs. N.T. 11/7/14 at 196. Medium length hairs and skin particles were also recovered from various items, including a scrub brush, found inside a tool bag recovered from another part of the house. N.T. 11/10/14 at 43-52. The DNA profile taken from the hairs on the scrub brush were determined to match the DNA profile of the victim. *Id.* at 89. Five unused black garbage bags with blue draw strings, which were identical to the bags containing the victim's body parts, were found in the attic of the house. N.T. 11/7/14 at 143. Fingerprints found on the garbage bags from the attic matched those of appellant. N.T. 11/10/14 at 36. The search of the home also produced a pair of human hands wrapped in socks, newspaper pages dated February 4, 2008, and Ziplock bags; the hands were found inside a large access panel for the bathroom plumbing. N.T. 11/7/14 at 162-168. Socks found in appellant's bedroom and unused Ziplock bags found in the kitchen were exact matches with those used to wrap the hands. *Id.* at 185-189. The fingerprints from the recovered hands matched those of the victim. N.T. 11/10/14 at 37. Appellant was taken into custody and charged with the murder of Deanna Null. *Id.* at 161.

Prior to trial, the Commonwealth filed a notice pursuant to Pennsylvania Rule of Evidence 404(b)(3) informing appellant of its intention to introduce evidence of prior bad acts through the testimony of eight women with whom appellant had a sexual and/or prostitution-type relationship, which also involved the use of illegal narcotics such as crack cocaine. Commonwealth's Pa.R.E. 404(b) Notice, 3/26/10 at 1.[3] The Commonwealth sought to introduce the evidence in order to buttress circumstantial evidence in the case by showing motive, identity and intent, as well as to rebut any defense based on accidental death. *Id.* at 1-2. The proposed witnesses — identified as Cheryl Denise Phillips, Lakessia Roshe Mayfield, Suzanne Downing, Lakisha Muhammad a/k/a Lakisha Washington, Karen Lovell, Misty Kay Chavez, Sheinina Hicks, and Kim Alston — would testify to appellant's alleged assaults on them which included beating, choking, and threats with edged weapons. *Id.* The Commonwealth posited the proposed testimony would demonstrate a common scheme on the part of appellant to victimize prostitutes, or women engaging in prostitution to satisfy their addictions to controlled substances, such as the victim in the present case. *Id.* at 1-2.

Appellant filed a motion to exclude Rule 404(b) testimony and, in response, the trial court ordered the Commonwealth to file an offer of proof for each witness. The Commonwealth filed offers of proof for seven of the eight witnesses,[4] alleging their

---

[3] Rule 404(b)(1) provides "evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, subsection (2) of the rule provides such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

[4] The Commonwealth did not provide an offer of proof with respect to Lakessia Roshe Mayfield.

experiences with appellant bore striking similarities to the victim's murder for the following reasons: all were women who had engaged in prostitution and drug use with appellant, who had admitted to having sex and using drugs with the victim; the witnesses were assaulted primarily by being beaten or choked with appellant's hands, and the blunt force trauma suffered by the victim was consistent with this type of assault; several of the witnesses were threatened with edged weapons, and the victim suffered numerous injuries by edged weapons; disputes arising out of a sexual encounter appeared to be the motive for many of the assaults, and appellant admitted having a sexual relationship with the victim. Commonwealth's Pa.R.E. 404(b) Offers of Proof, 4/27/11 at 6. The Commonwealth also argued the probative value of the evidence outweighed any unfairly prejudicial effect as its case against appellant was based primarily on circumstantial evidence. *Id.* at 7.

After subsequent briefing by the parties, the trial court determined the testimony of Alston, Lovell and Chavez was admissible pursuant to Rule 404(b), while the testimony of Phillips, Washington, Hicks and Downing was inadmissible as cumulative, and its prejudicial effect would outweigh its probative value. Tr. Ct. Opinion, 7/14/11 at 15. The Commonwealth filed an interlocutory appeal and appellant cross-appealed. The trial court's ruling was affirmed by the Superior Court, and the Commonwealth petitioned this Court for allowance of appeal. This Court accepted review and ultimately reversed the Superior Court's decision, remanding to the trial court for further proceedings regarding the admissibility of testimony from the excluded witnesses Phillips, Washington, Hicks and Downing. *Commonwealth v. Hicks*, 91 A.3d 47 (Pa. 2014). The Court held the trial court should have deferred balancing probative value against prejudicial effect until trial, and stated, "the [trial] court erred in ruling which

witnesses would be the cumulative ones, restricting which ones the prosecution might call." *Id.* at 55.

On remand, the trial court held the testimony of Phillips, Washington and Hicks was admissible, while again ruling the testimony of Downing was inadmissible. The Commonwealth ultimately presented the testimony of Alston, Chavez and Washington at trial. Twice during trial and with significant detail while charging the jury at the close of the guilt phase, the trial court instructed the jury the witnesses' testimony was not offered to show appellant's bad character, but for the "very limited purpose" of proving intent, motive, common plan or scheme and lack of accident. N.T. 11/7/14 at 59-60, 88; N.T. 11/14/14 at 110-12.[5]

---

[5] Specifically, while charging the jury after the guilt phase, the trial court stated:

Allowed into evidence was certain testimony regarding alleged instances between Mr. Hicks and other women occurring prior to these alleged offenses and the offense for which he is on trial currently. The testimony I'm referring to was from Ms. Alston, Ms. Kim Alston, Ms. Lakisha Washington, and Ms. Misty Chavez. That evidence is before you for a very limited purpose, and that is to prove an absence of accident or mistake on this occasion and as evidence of intent, motive, and ill will towards the victim in this case, Deanna Null. Evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible for other purposes including showing an absence of accident. Evidence of other crimes, wrongs, or acts may be admissible to prove motive, intent, and absence of accident. In other words, if it is believed by you, the evidence concerning circumstances of these other instances may only be used to infer that Ms. Null's death was not accidental. Also, if you choose to consider, you may consider the evidence when finding what the state of mind was during the course of events involving the victim in this case. That's the intent part. Intent is a mental state that can be inferred from conduct. Evidence of prior occurrences and prior offenses, if they are related to the offense for which the Defendant is on trial, may be admitted to show intent. So it's a very narrow and limited purpose for which that evidence is admitted. This evidence may not be considered by you in any other way other than for the purposes I just stated. You must not regard this evidence as showing that the Defendant is a person of bad character or criminal propensity from which you might infer guilt in this case.

N.T. 11/14/14 at 10-12. In addition, during trial, the court instructed the jury as follows:

(continued…)

Alston, a recovering drug addict, testified she was living in Virginia in 2006 when she relapsed on marijuana and cocaine. N.T. 11/6/14 at 186-87. During her relapse, she was brought to appellant's home by a woman named Yvette. *Id.* at 187. Alston provided appellant with approximately $200 worth of crack cocaine. *Id.* at 192. After Yvette departed, appellant and Alston argued over money for the drugs. *Id.* As Alston observed appellant become very angry, she ended the argument and attempted to leave the house. *Id.* at 192-93. Appellant displayed a gun and verbally threatened to kill Alston, while Alston again attempted to leave and refused to give appellant more

---

(…continued)

So the evidence that comes in from both Ms. Washington and Ms. Alston -- the evidence that you heard yesterday and that you may hear today is being offered for a particular purpose, and you could only consider it for a particular purpose, and it's very limited, and that would be because it is evidence which if believed by you -- again, you're judging credibility like you would any other witness -- but if believed by you would show that certain things happened unrelated to this case but at some earlier point in time. And it's offered only and can be used only to prove an absence of accident or mistake on this occasion in this case and as evidence of Mr. Hicks' intent and motive, okay.

In other words, if the evidence is believed by you, the evidence concerning the circumstances of these other incidents on prior occasions may only be used to infer that Ms. Null's death was not accidental, not that it was committed by Mr. Hicks. As well as that, you can consider this evidence with respect to intent.

So, that is, what was the state of mind during the course of events involving the victim in this case, Ms. Null? It can't be considered by you in any other way. And, that is, you may not and must not use this evidence to infer that Mr. Hicks is a person of bad character or criminal propensity from which you might infer guilt.

N.T. 11/7/14 at 59-60. And, later, the court further stated:

Again, this is the same caution to the jurors and the same instruction I gave you as to Ms. Alston and Ms. Washington, that this witness' testimony, if believed by you, is offered not to show and may not be regarded as evidence of Mr. Hick's bad character or criminal tendencies but solely to prove motive, common plan or scheme, lack of accident, and as to this particular witness identity of the perpetrator of this particular crime that we're here in trial for, okay.

*Id.* at 88.

drugs. *Id.* at 193, 195. Appellant then grabbed Alston by the throat and choked her until she was unconscious. *Id.* at 196. When Alston regained consciousness, appellant was sitting on top of her, both of them were naked, and appellant had a knife to her throat while attempting to penetrate her sexually. *Id.* at 196, 199. When appellant allowed Alston to leave the house, he refused to give her her clothes; Alston ran out of the house naked, a neighbor gave her clothes, and she called the police. *Id.* at 198. Charges filed against appellant were eventually dismissed when Alston failed to appear for court. *Id.* at 207. Alston testified this was the first and last time she ever saw appellant, and she has been in recovery from drug use ever since. *Id.* at 200.

Washington testified she was living in Fort Worth, Texas in 2003 when she first used crack cocaine. N.T. 11/7/14 at 62. At this time, Washington was a prostitute and would offer sex for drugs or money. *Id.* at 81. One evening, Washington went to a known drug area and entered a car with a man named Ronnie Hogan. *Id.* Washington and Hogan went to the Relax Inn and partied all night with appellant. *Id.* The next morning appellant and Hogan left the hotel to get Hogan's car fixed. *Id.* at 62-63. Appellant then returned to the hotel without Hogan and agreed to take Washington to get heroin. *Id.* at 64. Washington testified that, after using the heroin, she was in and out of consciousness all day, until she woke up in appellant's truck parked on a dark property. *Id.* at 63-65. As Washington and appellant smoked crack in the truck, appellant asked her to touch her vagina. *Id.* at 66. Washington stated she complied with the request because "it's like an unwritten rule that if you give me the drugs . . . I give you the sex." *Id.* When appellant began driving back to the highway, the two argued about directions. *Id.* at 67. As Washington attempted to exit the vehicle, appellant angrily grabbed her by the neck and pulled her back inside. *Id.* Appellant calmed down and allowed Washington to drive back to the Relax Inn, but then told her if

she left the vehicle he would kill her.  *Id.* at 68.  Notwithstanding appellant's threat, Washington left the vehicle and attracted the attention of the hotel manager, who called police.  *Id.*  Washington testified this was the only time she ever saw appellant.  *Id.* at 69.

Chavez testified she was living in Arlington, Texas in the 2002-2003 time period when she met appellant.  *Id.* at 90.  Chavez was unemployed and supporting her cocaine addiction through prostitution.  *Id.* at 92.  Chavez testified she was introduced to appellant by her girlfriend and used drugs with him a couple times a week, but their encounters did not always involve sex.  *Id.* at 92-93.  After several months of this relationship, appellant and Chavez had an argument while driving on Highway 360 about where she was buying drugs.  *Id.* at 93.  Chavez said to appellant, "I'm not the bitch that you can control."  *Id.*  Appellant became angry and reached over the center console, choking Chavez until she felt she would black out, cutting her skin with his fingernails in the process.  *Id.* at 94, 97.  Chavez opened the vehicle door to escape, but closed it after appellant told her to "Shut the door, or I'll kill you."  *Id.*  Appellant exited the highway, pulled the car over and said he was sorry; the two returned to his apartment.  *Id.* at 95-96.  When Chavez attempted to leave the apartment in her own vehicle, appellant pleaded with her to stay and let him clean the blood off her neck.  *Id.* at 97-98.  Appellant said, "Misty, I'm sick.  I've done this before.  That's why I can't keep relationships.  Something's wrong with me."  *Id.* at 98.  Chavez stopped seeing appellant after this incident.  *Id.* at 100.  Finally, Chavez testified she received a call from appellant about a year later during which he said "I hurt her.  Misty, I hurt her."  *Id.* at 101.  Chavez stated she could hear a female screaming in the background during the phone call.  *Id.*

Appellant presented the testimony of Dr. John J. Shane, who had extensive experience in forensic pathology but was not board certified. N.T. 11/12/14 at 11. Dr. Shane testified he reviewed Dr. Funke's autopsy report and concluded the victim's bruising and lacerations occurred after her death. *Id.* at 15-33. Dr. Shane also concluded the victim's cause of death was most likely related to substance abuse and accidental. *Id.* at 37. At the conclusion of the guilt phase, the jury convicted appellant of first-degree murder, tampering with evidence, and abuse of corpse.

The Commonwealth moved to introduce all guilt phase evidence into the record for the penalty phase, and the trial court granted the motion with no objection from appellant. N.T. 11/17/14 at 16. The Commonwealth asked the jury to find the torture aggravator, 42 Pa.C.S. §9711(d)(8), and stipulated to the mitigator of no significant criminal history, 42 Pa.C.S. §9711(e)(1). *Id.* at 6. Appellant introduced testimony from his family which focused on their family's history of substance abuse and mental illness, as well as appellant's depression and attempts at suicide. *Id.* at 46-47, 57. Appellant also presented the testimony of Dr. Kenneth J. Weiss, a psychiatrist, who interviewed appellant and reviewed his medical history. Dr. Weiss concluded appellant's depression was caused by a number of adverse childhood experiences, and his drug use exacerbated his depression and fueled his violent behavior. *Id.* at 89-92. Appellant also presented testimony from several witnesses who interacted with him during his incarceration and testified he is a respected model prisoner with no disciplinary problems. N.T. 11/18/14 at 8, 10, 15 43-45. Finally, appellant introduced the testimony of Dr. Carol Armstrong, a neuropsychologist, who performed various tests and concluded appellant has many cognitive impairments which would not occur in a typical healthy individual and would affect his ability to make good judgments. *Id.* at 20-27.

The jury ultimately sentenced appellant to death, finding the aggravating factor of torture outweighed any mitigating factors.

Appellant filed post-sentence motions raising claims related to the sufficiency and weight of the evidence, ineffectiveness of trial counsel, and challenging the trial court's admission of the testimony of Alston, Washington and Chavez relating to his alleged prior bad acts.[6]  In explaining why it allowed the witnesses' testimony, the court relied in part on *Commonwealth v. Weakley*, 972 A.2d 1182 (Pa. Super. 2009), to analyze the similarities between Deanna Null's murder and the prior acts across several factors. *See id.* at 1189 (court must consider: "(1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims.").

The trial court found significant similarities among the incidents: each involved appellant attacking a woman in the neck area as an immediate reaction to her not behaving in the way he desired.  Tr. Ct. Opinion, 8/18/15 at 30-31.  The court further noted the same weapon was used in attacking each victim around the neck, *i.e.*, appellant's own hands.  *Id.* at 31.  The court also found the ostensible purpose of each crime was identical — appellant always attacked as an expression of control.  *Id.*  The court acknowledged the location factor did not support admissibility as the acts occurred in different places, but the type of victim was consistent; the court noted Deanna Null and the witnesses were of similar body types and all were drug users, appellant demonstrated a sexual interest in each woman, and the attacks occurred while appellant was alone with them.  *Id.*  The court concluded the prior incidents were

---

[6] Appellant's counsel also filed a motion to withdraw and to appoint new counsel to litigate appellant's collateral claims.  The only issue raised by appellant on direct appeal in this Court is his challenge to the trial court's admission of the Rule 404(b) other acts evidence.

sufficiently similar to the charged crime to be admissible. *Id.* The court further opined that, with regard to showing common plan or scheme, proof of one incident "tends to prove the others," *id.* at 32, and the jury was correctly told the evidence could be used to establish intent, motive, common plan or scheme, and lack of accident, as well as the identity of the perpetrator. *Id.* at 31-32. The court concluded the details of the various other acts were not "simply insignificant details that would likely be common no matter who perpetrated the crime," reiterating the victim and the witnesses were involved in crack cocaine use, appellant had a sexual relationship with the victim and showed a sexual interest in the witnesses, possible causes of the victim's death included asphyxiation or decapitation, and appellant violently attacked all of the witnesses in their neck area. *Id.* at 32-33. The court denied post-sentence relief and this direct appeal followed.

## II. Sufficiency of the Evidence for First-Degree Murder

Appellant does not challenge the sufficiency of the evidence and did not brief the issue, but in all capital direct appeals, this Court conducts an independent review of the sufficiency of the evidence supporting a first-degree murder conviction, even if the defendant does not raise the claim. *See Commonwealth v. Zettlemoyer*, 454 A.2d 937, 942 n.3 (Pa. 1982) (to fulfill review obligation imposed by 42 Pa.C.S. §9711(h), Court shall review sufficiency of evidence supporting first-degree murder, even where appellant does not contest sufficiency). The standard of review for evidentiary sufficiency is whether the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding that every element of the offense was proven beyond a reasonable doubt. *Commonwealth v. Watkins*, 843 A.2d 1203, 1211 (Pa. 2003). The Commonwealth may sustain this burden by wholly

circumstantial evidence and the jury is free to believe all, part, or none of the evidence. *Commonwealth v. Cousar*, 928 A.2d 1025, 1032-33 (Pa. 2007). "To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed, that the defendant was the killer, and that the defendant acted with malice and a specific intent to kill." *Commonwealth v. Laird*, 988 A.2d 618, 624-25 (Pa. 2010), *citing* 18 Pa.C.S. §2502(a). Specific intent and malice may be inferred through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Houser*, 18 A.3d 1128, 1133-34 (Pa. 2011).

When viewing the evidence in the light most favorable to the Commonwealth, the record establishes the victim, with whom appellant used drugs and engaged in sex, was badly beaten, strangled and decapitated with a saw blade or knife prior to her death. Furthermore, appellant had a history of violent conduct toward drug-addicted women who may have been prostitutes or with whom he otherwise had a sexual relationship. Also, appellant was the last person seen with the victim before her disappearance, blood was found in his car and on his boots, the victim's hands were found in the walls of his house and other materials found in the house matched the materials used to discard the victim's body. Although there was conflicting expert testimony regarding the circumstances of the victim's death and whether her wounds were pre- or post-mortem, the jury was free to believe the testimony of the Commonwealth witnesses and disbelieve the testimony of the defense witnesses. The jury's verdict that appellant unlawfully killed the victim with malice and the specific intent to kill was supported by the evidence of record and we will not disturb that finding.

### III. Evidence of of Rule 404(b) Crimes, Wrongs or Other Acts

In his only briefed issue on appeal, appellant argues the trial court abused its discretion in admitting evidence of criminal allegations by the witnesses. Appellant claims the trial court erred in its analysis of the above mentioned *Weakley* factors because the only similarities between the prior incidents and the victim's death was that appellant allegedly used his hands on or around the neck area of all the women. Appellant argues there were significant differences between the encounters, including: his reasons for arguing with the women; the location of the incidents and his relationship to the witnesses and the victim (one was his girlfriend while the others were acquaintances). Appellant further argues the level of violence in the "other acts" evidence is clearly distinguishable from the level of violence perpetrated on the victim. Appellant insists the dissimilarities far outweigh their similarities such that the other acts testimony was prejudicial and irrelevant.

The Commonwealth maintains the Rule 404(b) evidence was properly admitted for the legitimate purpose of proving appellant's common scheme, his identity, and the lack of accident. The Commonwealth argues the trial court, after analyzing the *Weakley* factors, correctly found significant similarities between the crimes committed against the witnesses and the murder of the victim, including the fact the witnesses were attacked in the neck area and the victim was strangled and decapitated. Commonwealth's Brief at 10-12, *citing Weakley*, 972 A.2d at 1189. According to the Commonwealth, the probative value of the other acts evidence far outweighed any unfairly prejudicial effect as the case against appellant was mainly circumstantial; there were no witnesses to the crime, no confession from appellant, and the victim's body was badly decomposed. Furthermore, the Commonwealth notes the defense introduced expert testimony suggesting the victim died of a drug overdose, and the other acts evidence effectively countered the suggestion of accidental death. The Commonwealth asserts the

evidence was necessary to support its circumstantial case and rebut the defense's theory, as well as to prove a common plan or scheme, motive and identity.

"Evidence is admissible if it is relevant — that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact — and its probative value outweighs the likelihood of unfair prejudice." *Commonwealth v. Boczkowski*, 846 A.2d 75, 88 (Pa. 2004) (citations omitted). Admissibility of evidence is within the sound discretion of the trial court and we will not disturb an evidentiary ruling absent an abuse of that discretion. *Commonwealth v. Arrington*, 86 A.3d 831, 842 (Pa. 2014), *citing Commonwealth v. Flor*, 998 A.2d 606, 623 (Pa. 2010). Moreover, "evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." *Boczkowski*, 846 A.2d at 88. *See also Arrington*, 86 A.3d at 842, *citing* Pa.R.E. 404(b)(1); *Commonwealth v, Morris*, 425 A.2d 715, 720 (Pa. 1981) (law does not allow use of evidence which tends solely to prove accused has "criminal disposition"). Such evidence may be admitted to show motive, identity, lack of accident or common plan or scheme. *Arrington*, 86 A.3d at 842, *citing* Pa.R.E. 404(b)(2); *Commonwealth v. Briggs*, 12 A.3d 291, 337 (Pa. 2011) (Rule 404(b)(2) permits other acts evidence to prove motive, lack of accident, common plan or scheme and identity). In order for other crimes evidence to be admissible, its probative value must outweigh its potential for unfair prejudice against the defendant, Pa.R.E. 404 (b)(2), and a comparison of the crimes proffered must show a logical connection between them and the crime currently charged. *Arrington*, 86 A.3d at 842.

This Court has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity — or logical connection —

between the proffered prior bad acts and the underlying charged crime. As early as 1872, in *Shaffner v. Commonwealth*, 72 Pa. 60 (1872), the Court described the importance of such a connection as follows:

> It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. . . . To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.

*Id.* at 65. *See also Commonwealth v. Wable*, 114 A.2d 334, 336-37 (Pa. 1955) (there must be "such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other"); *Commonwealth v. Chalfa*, 169 A. 564, 565 (Pa. 1933) (other bad acts evidence "must show some logical connection between the offenses"). "Sufficient commonality of factors" between the other incidents and the underlying crime "dispels the notion that they are merely coincidental and permits the contrary conclusion that they are so logically connected they share a perpetrator." *Weakley*, 972 A.2d at 1189.

In further explaining the logical connection standard, this Court has noted "'much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature.'" *Commonwealth v. Rush*, 646 A.2d 557, 560-61 (Pa. 1994) (crimes containing uniquely similar attributes constitute a signature), *quoting* McCormick on Evidence, §190 at 449 (2d Ed. 1972) (emphasis omitted). *See also Commonwealth v. Hughes*, 555 A.2d 1264, 1282 (Pa. 1989) (similarities in crimes not confined to insignificant details represent a signature); *Weakley,* 972 A.2d at 1189

(identity of perpetrator in underlying crime may be proved through other acts where they "share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant").

This Court has consistently held there was no abuse of discretion in allowing other crimes evidence in circumstances substantially similar to those presented here. *See, e.g., Commonwealth v. Elliott*, 700 A.2d 1243, 1250 (Pa. 1997) (logical connection found where three women in their twenties were choked, beaten or both in early morning hours while alone with defendant), *abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003); *Commonwealth v. Miller*, 664 A.2d 1310, 1318 (Pa. 1995) (logical connection found where defendant lured women of similar appearance into his car, took them to remote areas to rape and beat them in a similar manner), *abrogated on other grounds by Commonwealth v. Hanible*, 836 A.2d 36 (Pa. 2003); *Commonwealth v. May*, 656 A.2d 1335, 1341 (Pa. 1995) (logical connection found where victims were physically similar, attacks were of similar nature, and body of victim was found close to where defendant left other assault victims); *Rush*, 646 A.2d at 561 (logical connection found where rape victims were young black women, had undergarments pulled from them and were attacked and restrained with knives); *Hughes*, 555 A.2d at 1282-83 (logical connection found between two rapes where both victims were sexually immature, were taken off the street, were alone with defendant, and were choked). *But see Commonwealth v. Fortune*, 346 A.2d 783, 787 (Pa. 1975) (no logical connection where there is nothing distinctive to separate other acts from common street crimes).

Most recently, this Court applied the logical connection standard in *Arrington, supra.* Tondra Dennis dated defendant Arrington for a few years, but eventually had him arrested for a series of physically and emotionally abusive incidents including

beatings, death threats and break-ins. *Arrington*, 86 A.3d at 837-38. Arrington was incarcerated for a period of time, but was released after Dennis recanted her allegations. *Id.* at 838. Ten days after Arrington's release, Dennis was found murdered just 357 feet from the residence Arrington previously shared with his mother. *Id.* at 839.

As there was no physical evidence linking Arrington to the murder and the case was largely circumstantial, the Commonwealth was permitted to introduce evidence of other acts involving three of Arrington's girlfriends, their families and their friends, as well as prior crimes against Dennis herself. *Id.* at 839. The following evidence was presented at Arrington's trial. Arrington dated Victoria Dexter for some time and began to follow and telephone her continuously as the relationship progressed. *Id.* at 843. When Dexter attempted to end the relationship, Arrington threatened her, set fire to her apartment, slashed her furniture, beat her and hit her brother with a baseball bat. *Id.* Arrington was incarcerated after pleading guilty to numerous crimes, but once paroled, he began dating Sandra Williams, whom he assaulted three times during their two-year relationship. *Id.* Arrington also pistol-whipped Williams after seeing her with a male friend and struck another male friend of Williams in the shoulder with an axe before firing a gun at him. *Id.* Arrington was again incarcerated, and began dating Dennis soon after his release; after Dennis's death, Arrington began dating Tanesha Jacobs. *Id.* Arrington punched Jacobs in the face for smiling at a group of men on a local beach and Jacobs ended the relationship; Arrington then began stalking her and threatening to kill her and her family until she left the country to live with her mother. *Id.* at 844. Arrington continued his threats *via* telephone, threatening to kill Jacobs's brother, who later died, and when Jacobs returned to the United States for her brother's funeral, Arrington's stalking resumed. *Id.* Shortly thereafter, Arrington was arrested and charged with Dennis's murder. *Id.* at 839.

Upon being found guilty of first-degree murder and sentenced to death, Arrington challenged the admissibility of the other acts on direct appeal to this Court. *Id.* at 837, 841. The Court held the shared characteristics of Arrington's conduct during his other relationships proved a logical connection between his prior bad acts and the underlying charged crime of Dennis's murder:

> [The] evidence was not introduced in order to "portray him as a habitual criminal with a propensity for violent behavior." Rather, it was offered to establish that [Arrington] acted pursuant to a common plan or scheme. The testimony concerning [Arrington's] treatment of other girlfriends demonstrated repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly weapon. In each instance, [Arrington]: (1) monitored his girlfriend's daily activities; (2) resorted to violence when his partner wanted to end a relationship or interacted with other men; (3) inflicted head or neck injuries with his fist, a handgun, or an edged weapon; and (4) harmed or threatened to harm members of his girlfriend's family or male acquaintances that he viewed as romantic rivals. Given the shared characteristics of each relationship, the evidence fell within the purview of Pa.R.E. 404(b)(2).

*Id.* at 844 (citations omitted). The Court further concluded the evidence was relevant, reliable, and probative of guilt, and "strengthened the prosecution's case, which consisted entirely of circumstantial evidence. . . ." *Id.* at 844-45. The Court also relied on the fact that the trial court provided the jury with "comprehensive limiting instructions." *Id.* at 845.

Like the evidence allowed in *Arrington*, the evidence about appellant's prior relationships with and assaults upon Alston, Washington and Chavez showed they were strikingly similar to the circumstances surrounding his relationship with the victim, her injuries, and her subsequent death, such that there was a logical connection between them. In each case appellant: (1) was introduced to drug-dependent women of similar body types for purposes of using drugs; (2) showed a sexual interest in the women, sometimes involving prostitution; (3) resorted to violence when the women behaved in a

way he found disagreeable; (4) inflicted injuries on each woman by targeting her neck area with his hands, a sharp edged object, or both; and (5) verbally threatened to kill each woman.[7]

These similarities not only establish the required logical connection between the prior assaults and the circumstances surrounding the victim's death, they also present a "virtual signature" for purposes of proving common scheme, intent and identity. They are not mere insignificant details of crimes of the same class, where there is nothing distinctive to separate them from, for example, common street crimes. *Compare Hughes*, 555 A.2d at 1283 (logical connection where similarities are not confined to insignificant details but rather represent a signature) *with Fortune,* 346 A.2d at 787 (no logical connection where there is nothing distinctive to separate other acts from common street crimes). *See also Weakley,* 972 A.2d at 1189 (sufficient commonality of factors between crimes dispels notion they are merely coincidental and permits conclusion they are so logically connected as to share a perpetrator). There was substantial evidence presented that Deanna Null engaged in sex and drug use with appellant, was beaten, strangled, and had her throat cut by a sharp-edge weapon, ultimately resulting in her beheading and death. As in *Arrington*, the only material difference between the prior assaults and the underlying charged crime is that appellant's typically violent behavior finally progressed to a fatal attack. However, this difference does not undermine the analysis leading to admissibility of the evidence regarding the prior incidents. *See Arrington*, 86 A.3d at 844-45. *See also Hughes*, 555

---

[7] We rely on the trial court's observation that the witnesses and victim had similar body types. Tr. Ct. Opinion, 8/18/15 at 31 ("The victim and the three witnesses were all of a similar body type."). Our reliance is not misplaced. *Cf. Commonwealth v. McCracken*, 659 A.2d 541, 551 (Pa. 1995) (trial court's findings based on observation of witnesses are entitled to deference on appeal).

A.2d at 1283, *citing Commonwealth v. Clayton*, 483 A.2d 1345, (Pa. 1984) (other acts evidence involving prior choking victim who was injured but not killed admissible to show defendant killed second choking victim); *Weakley*, 972 A.2d at 1190 (one difference between the crimes at issue which fails to undo identity analysis is that other crime did not culminate in murder).[8]

Where a logical connection between the other crimes and the underlying charged crime has been established, as it was here, the court must also determine whether the probative value of the evidence outweighs any unfair prejudice. *See* Pa.R.E. 404(b)(2) (crimes, wrongs or other acts evidence admissible only when its probative value outweighs its potential for unfair prejudice); *Morris*, 425 A.2d at 720 (other acts evidence admissible when probative worth outweighs tendency to unfairly prejudice jury). Obviously, the impact of introducing evidence of other crimes is significant and may be highly prejudicial. *Fortune*, 346 A.2d at 787. However, such evidence is also highly probative when the Commonwealth's case is otherwise based largely on circumstantial evidence. *See Arrington*, 86 A.3d at 844-45 (prior crimes evidence plays important role where prosecution is based on circumstantial evidence); *Miller*, 664 A.2d at 1319 (other acts evidence necessary when Commonwealth only had circumstantial evidence); *Weakley*, 972 A.2d at 1191 (where prosecution's case is largely circumstantial specific purpose of other crimes evidence is "to give jury the insight into the significance of these

---

[8] Justice Donohue declares the prior bad acts evidence presented here was "not even of the same class as the charged crime," and insists appellant's violent, neck-focused assaults on a series of women are wildly different from the underlying murder because he did not also kill and dismember his earlier victims. Dissenting Opinion, Donohue J., slip. op. at 22 (internal quotation marks omitted). We recognize there would be an even stronger correlation between the other acts and the victim's death had appellant's violence escalated to the murder of one or more of the witnesses, but our most recent case law is clear such a perfect match is not required. *Arrington*, 86 A.3d at 844-45. *See also Weakley*, 972 A.2d at 1190.

circumstances"). Although the Commonwealth presented evidence the victim's hands were found behind the walls in appellant's home, this circumstantial evidence alone did not establish the victim's death was not an accidental overdose (as suggested by the defense), and that appellant did not, for example, merely dispose of her body afterwards. For this reason, evidence regarding appellant's assaults on Alston, Washington and Chavez was relevant and probative to show lack of accident, and that appellant acted intentionally in all instances with a common scheme: violently attacking a woman with whom he engaged in drug use and sex, in the neck, after a disagreement. Moreover, as in *Arrington*, the trial court's detailed instructions properly informed the jury of the limited and narrow purpose for which the evidence was admitted and thus restricted any unfair prejudicial effect. *See* N.T. 11/7/14 at 59-60, 88; N.T. 11/14/14 at 110-112; *Arrington*, 86 A.3d at 845 (comprehensive limiting instructions to be considered when balancing probative value and prejudicial impact); *Boczkowski*, 846 A.2d at 89 (limiting instructions weigh in favor of upholding admission of other bad acts evidence).

Accordingly, we hold the trial court did not abuse its discretion in admitting Rule 404(b) evidence regarding other crimes, wrongs or acts by appellant. The witnesses' testimony about their encounters with appellant shared such strikingly similar circumstances and characteristics with the evidence surrounding the victim's death that it tended to establish the elements of first-degree murder instead of accidental death, and also that appellant was the perpetrator. Furthermore, the probative value of the evidence to the Commonwealth's largely circumstantial case clearly outweighed any unfair prejudicial effect, which was properly limited by the trial court's cautionary instructions to the jury. Appellant's claim the evidence should not have been admitted therefore fails.

## IV. Statutory Review of Death Penalty Verdict

As we have determined there was sufficient evidence to sustain appellant's conviction for first degree murder, and his claim regarding Rule 404(b) evidence does not warrant relief, we now determine whether the death sentence was the product of passion, prejudice, or any other arbitrary factor, or the evidence does not support the finding of at least one aggravating circumstance. *See Arrington*, 86 A.3d at 857, *citing* 42 Pa.C.S. §9711(h)(3). Our careful review of the record reveals the sentence was not the product of passion, prejudice, or any other arbitrary factor. To the contrary, the sentence was based on properly admitted evidence showing appellant intentionally killed the victim by cutting her throat with a knife. We further conclude the evidence was sufficient to support the aggravating circumstance of killing by means of torture as the Commonwealth expert witnesses testified the victim was severely beaten and strangled before being decapitated while she was still alive. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with 42 Pa.C.S. §9711(i).

Justices Todd and Mundy join the opinion.

Chief Justice Saylor joins Parts I, II and IV of the opinion and files a concurring opinion.

Justice Baer files a concurring opinion.

Justice Donohue files a dissenting opinion.

Justice Wecht files a dissenting opinion.